930 So.2d 1099 (2006)
STATE of Louisiana
v.
Byron L. DAVIS.
No. 05-KA-987.
Court of Appeal of Louisiana, Fifth Circuit.
May 9, 2006.
*1100 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Ken Dohre, William C. Credo, Assistant District Attorneys, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
JAMES L. CANNELLA, Judge.
The Defendant, Byron Davis, appeals from his conviction of second degree murder and sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the reasons which follow, we reverse and remand.
On January 30, 2003, the Jefferson Parish Grand Jury indicted the Defendant with the second degree murder of Kemmione Lee (Lee) in violation of La. R.S. 14:30.1. The Defendant was arraigned on February 5, 2003 and pled not guilty. The Defendant's motion to suppress evidence, statement, and identification was heard and denied on June 4, 2004.
On July 14, 2004, a Prieur[1] hearing was held after which the trial court denied the State's motion to introduce evidence of other crimes. On November 15, 2004, the trial court granted the State's motion to admit the victim's dying declaration and denied the Defendant's motion in limine to exclude photographs. The Defendant filed a writ application with this Court regarding the denial of his motion in limine which was denied on December 2, 2004.[2] On January 11, 12, and 13, 2005, the case was tried by a 12-person jury.
At trial, Dr. Fraser MacKenzie, a forensic pathologist with the Jefferson Parish Coroner's Office and an expert in the field of forensic pathology, testified that Lee died on January 16, 2000 at 3:00 a.m. of a gunshot wound to the right chest with perforating wounds to the liver and stomach.
Jarvis Wells[3] (Wells) testified at trial that, on January 15, 2000, at approximately 10:00 p.m., he and Lee ran some errands, *1101 including a stop at a house on Wilker Neal Street. Afterwards, they went to Lee's mother's apartment on Idaho Street in Kenner so Lee could get some clothes to take to his girlfriend's house.[4] Wells went into the apartment with Lee, but later left to wait for him in the car. When Wells got to the car, a man with a chrome gun came from behind the bushes, grabbed him, told him, "[c]ome here; don't move," and asked him for his brother's whereabouts. Wells told the man that he did not know what he was talking about, and the man then escorted him back through the gate. Wells testified that, when they got back to the apartment, the man and Lee made eye contact, and Lee said, "[b]..tch," "like he knew who it was." Wells further testified that Lee tried to run back into the house, but that the man shot Lee one time, threw him (Wells) to the ground, and ran. Wells lay there until Lee told him to go and call an ambulance and the police.
Wells testified that the man who shot Lee was dressed in black and had a black rag tied around his head. He explained that he could see the man's face, but that he was not really paying attention because he was being held at gunpoint. Wells testified that the only thing he could see was that the man had "two golds [teeth] in his mouth spaced apart."
Wells testified that he ultimately looked at five separate photographic lineups containing six pictures in each lineup. Although he could not identify anyone in the first four lineups, he tentatively identified the Defendant in the fifth photographic lineup on February 17, 2000. On the back of the fifth photographic lineup, Wells wrote, "[t]his may be the person that shot Kemmy." Wells indicated to Detective Shaun Watson that he would have been more certain of his identification if he could have seen the gold teeth. Wells looked at the Defendant in the courtroom and noted that he did not have any gold teeth.
Officer Adolph Federico of the Kenner Police Department testified that he responded to a shooting that was approximately a block away. He arrived at the scene and saw Lee lying on his back, noting that he was bleeding from an abdominal wound. Officer Federico asked Lee several times who shot him, and Lee repeatedly responded that it was "a dude in a white escort."
Joshua Williams (Williams) was called by the State as a witness at trial; However, he asserted his Fifth Amendment privilege not to testify.
Vincent Paciera, Jr. (Paciera), a Jefferson Parish assistant district attorney, testified that, on January 13, 2003, he was present at a court proceeding in which Williams pled guilty. Paciera indicated that Williams had also been charged with second degree murder in this case, but that he pled guilty to manslaughter and gave a note of evidence under oath. Paciera testified that, as part of this guilty plea, Williams was given five years imprisonment and had agreed to testify truthfully against the Defendant.
Paciera testified that Williams stated during the plea colloquy that he was with the Defendant (who was also known as "Head") on January 15, 2000, and that he went with the Defendant to an Idaho Street address. According to Paciera, Williams stated that he and the Defendant went to buy drugs from Lee, that they were in a white car, and that when they got to the Idaho Street address he stayed *1102 in the car and used heroin while the Defendant got out of the car to go and see Lee. Paciera also testified that Williams said that he heard one shot and then saw the Defendant run back to the car. When the Defendant got back to the car, Paciera testified that Williams said that the Defendant told Williams that he had shot Lee and that the Defendant had a gun with him before he got out of the car and when he came back to the car.
Paciera explained that if he thought anything in the transcript of the plea was false, he would tell the jury. He added that he would not be allowed by law to take false testimony.
The State called several witnesses who provided background information surrounding the events of January 15, 2000: Stella Womack (Womack), Timothy Rainwater (Rainwater), Timothy Ivey (Ivey), and Viva Henderson (Henderson).
Womack testified that, on January 15, 2000, she was dating Williams. She stated that she saw Williams between "7:00 and 8:00," leave the "Washington area" with people she knew as "Head" and "Baby Pooch," and that Williams told her that they were going to his brother's house on Idaho Street. She did not know "Head's" real name but described him as having gold teeth on both sides of his mouth. Womack was shown a photographic lineup and positively identified the Defendant as the person she knew as "Head."
Rainwater testified that he was also known as "Baby Pooch." He stated that, on January 15, 2000, Williams told him that he was going by "his people's house" in Kenner. Rainwater wanted to catch a ride, so he got into a white car with Williams and two other men. Williams told Rainwater that he could not ride with them, so Rainwater exited the vehicle and caught a bus to Kenner, where he later saw the same men in a white car drive by at about 7:00 p.m. He positively identified the Defendant in court as the person he knew as "Head."
Ivey testified that, on January 15, 2000, he was outside on Wilker Neal Street with other people between 10:00 p.m. and 11:00 p.m. when he saw Lee drive up in a car with another man. Lee got out of the car, dropped $600 of drugs, picked them up, and went inside the house. Williams went inside the house. Ivey further testified that he saw a man dressed in black standing by a white car on Wilker Neal Street.
Henderson testified that she was the Defendant's former girlfriend, the mother of his child, and that she allowed the officers to search her residence at 3721 Thalia Street, Apartment D. Detective Shaun Watson of the Kenner Police Department testified that, during the search of Henderson's apartment, evidence was recovered, including three photographs showing the Defendant holding a gun, that were found on a dresser in the bedroom. Detective Watson also found a box of .45 caliber ammunition in Henderson's closet and two black leather jackets. Henderson contradicted testimony by the Defendant's mother regarding being in Florida with the Defendant on the day of the shooting. She also testified that the Defendant had gold teeth on both sides of his mouth.
Detective Watson testified that, on February 14, 2000, he advised the Defendant of his rights and interviewed him, but did not take a recorded statement. He asked the Defendant if he knew "Josh," and the Defendant told him that name did not sound familiar, but that did not mean he did not know him. The Defendant also told him that he had never been to Kenner. Detective Watson stated that, on August 2, 2002, he took another statement from the Defendant. The Defendant told him that he had read about the homicide in Kenner, but he denied ever being in *1103 Kenner, and he also denied knowing Williams and Womack.
Detective Watson testified that he showed Wells a photograph seized from Lee's mother, and that Wells identified Ivey in the photograph as a person that he saw on Wilker Neal Street. He further testified that Wells told him in a second interview that he had seen Ivey talking to the man dressed in black on Wilker Neal Street.[5]
Tim Scanlan (Scanlan), a forensic scientist for the Jefferson Parish Sheriff's Office crime laboratory and an expert in the field of forensic science and firearm examination, testified that he examined the casing recovered from the crime scene and the projectile recovered from Lee. He indicated that the casing was a Remington Peters .45 caliber auto fired cartridge case, and that it was consistent with being fired from a .45 caliber semi-automatic pistol. He determined that the jacket of the projectile was consistent with .45 caliber class ammunition, and that the projectile was most likely fired from a Ruger.
Scanlan reviewed enlargements of the photographs showing the Defendant holding a gun and testified that the gun shown was consistent with a Ruger semi-automatic pistol. He explained that the gun in the photographs could have been a 9 millimeter, a 40 millimeter or a .45 caliber weapon. Scanlan testified that the ammunition used in the shooting and the ammunition seized from Henderson's apartment were the same caliber and manufacturer (Remington Peters) but were two different models.
After the State rested its case, the defense called as a witness, Louise Walzer (Walzer), the assistant director and senior firearms examiner for the Jefferson Parish Crime Lab and an expert in the field of ballistics and firearm identification, who testified that, after examining the casing found at the scene, the projectile taken from Lee, and the photographs Scanlan had enhanced, she agreed with Scanlan's findings. Walzer also believed, as Scanlan did, that the gun shown in the photograph was probably a Ruger; however, she, like Scanlan, was unable to determine the caliber of the gun.
Jennifer Davis (Davis), the Defendant's mother, provided an alibi for the Defendant. She testified that she lived in Jacksonville, Florida, and that the Defendant and Henderson visited her there from January 14, 2000 to January 21, 2000. She explained that they were there to visit because her mother was ill and for a birthday party for her grandson.
Shantell Arnold (Arnold) testified that she was the Defendant's aunt, and that she was formerly employed at Metro Security as a security guard. She claimed that the gun that the Defendant was holding in the photographs was a 9 millimeter Ruger that belonged to her, that it was issued to her in connection with her duties as a security guard, and that she asked the Defendant to show her how to clean it, although she could not remember when that was. Arnold testified that she was present when the Defendant was cleaning the gun and when one of the photographs was taken, and that the Defendant did not have her gun on January 15, 2000.
After hearing the testimony and considering the evidence, the jury found the Defendant guilty as charged. The Defendant's motion for post-verdict judgment of acquittal was denied on January 13, 2005. On February 4, 2005, the Defendant's motion for new trial was denied. On that same date, the Defendant waived sentencing *1104 delays, and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On February 22, 2005, the Defendant filed a motion for appeal that was granted. On appeal, the Defendant assigns three errors.
All of the Defendant's assignments of error relate to the admission into evidence of an alleged co-defendant's, Joshua Williams', statements made in a separate proceeding when he pled guilty to manslaughter as part of a plea agreement in exchange for a five year sentence. The evidence was admitted by three different methods over the objections of defense counsel.
First, Williams was called to the stand by the State and he immediately asked the court for an attorney. The trial court refused the request. The prosecutor asked Williams if he pled guilty to manslaughter for the killing of Lee. Williams refused to respond. Williams indicated that he would like "to plead the fifth." After two more similar exchanges the trial court instructed Williams to answer the questions. He again refused. Then, out of the presence of the jury, the trial court advised Williams that he would be held in contempt if he refused to answer the questions.
Williams told the trial court that he was not going to answer the questions without a lawyer being present. The prosecutor then pointed out that he did not believe Williams understood that he did not have the right to an attorney because he was not incriminating himself. He noted that all of the questions regarding Williams' conviction were in public records, and that he would get those records and show those to Williams. The prosecutor further stated that every time Williams did not answer a question he would move for a contempt order and add six months to Williams' current sentence.
The trial judge again told Williams that he had to answer the questions. Williams refused, saying he needed a lawyer. The trial judge repeated that he did not have a constitutional right to a lawyer in this situation. Defense counsel stated that the witness deserved counsel since he invoked his right to the Fifth Amendment. The trial judge told Williams that he was not being asked any questions where he would be incriminating himself. Williams stated that he was going to refuse to answer any question that was asked of him that day. The trial judge said that they would take a recess in order to find an Indigent Defender Board (IDB) lawyer. After more discussion, the prosecutor asked for a recess to speak to Williams, which the trial judge granted.
After the recess, the trial judge ordered Williams, at the prosecutor's request, to answer the questions under La.C.Cr.P. art. 439.1[6], without the jury present at first, to *1105 see which questions he would answer. The prosecutor asked Williams if he was going to answer questions and Williams responded again that he wanted to "plead the Fifth and get a state lawyer." Williams said that it was his intention not to answer any further questions by the State and that he was going to disobey the trial judge's order. The prosecutor then asked the trial judge to take judicial notice of the pleadings in State v. Joshua Williams, 00-5112, Division "K" of the 24th Judicial District Court. Defense counsel argued that, if Williams was invoking the Fifth Amendment, then he was being denied the right of confrontation if that statement was admitted into evidence and that he had no way to cross-examine Williams because he was not present when that statement was taken.
The trial judge said that he did not think the prosecutor was going to introduce that statement into evidence. The prosecutor responded that he was going to ask Williams questions from his prior testimony, and the trial judge agreed he could do so. The jury was then brought back into the courtroom. Williams testified that he did not intend to answer any questions. The trial judge granted the prosecutor the right to treat Williams as a hostile witness. Then, the prosecutor again asked Williams whether he was the same individual who had pled guilty to manslaughter in case number 00-5112 in Division "K" of the 24th Judicial District Court. Williams did not respond and told the trial judge he refused to answer the question. Defense counsel objected to this line of questioning, noting that he had no way of confronting the witness, and that the inferences being drawn by his taking the Fifth Amendment could be harmful to the Defendant.
The prosecutor responded that defense counsel's right of confrontation was not being denied, and that he had the right to ask Williams questions. The trial judge agreed. The prosecutor then asked the trial court for an opportunity to research this issue, and the trial judge refused, stating that it had taken too long to get where they were. The prosecutor noted his objection and continued questioning Williams. At this point, the prosecutor began questioning Williams about his personal involvement and his knowledge of the Defendant's involvement in the shooting of Lee, by reading each line of what was said at the guilty plea proceedings, and asking Williams after each sentence whether he denied making the statement. Williams refused to answer each question. Defense counsel's attempts to cross-examine Williams were met with the same refusal to respond as were the State's attempts to question him. Williams refused to answer any questions.
After numerous questions had been posed, the trial judge told counsel to approach, and that there had to be a point at which he could not give Williams any more "contempts." After the jury was excused for the day, the trial judge found Williams in contempt of court and sentenced him to 20 counts of contempt with six months on each count to run consecutively to each *1106 other and to whatever sentence he was presently serving.
Next, the prosecutor requested that he be allowed to introduce the transcript from Williams' guilty plea proceedings into evidence. The trial court allowed the introduction of the transcript into evidence. The trial judge stated that it was for evidentiary purposes only and not for publication and was, therefore admissible.
Finally, on the morning of the next day of trial, the prosecutor advised the defense that, based on the events of the previous day, he intended to enlarge his witness list to include Vincent Paciera (Paciera), among others. Defense counsel objected, arguing that he had no right of confrontation if these additional witnesses were allowed to testify regarding hearsay statements made by Williams. The prosecutor responded that there were two bases for the admission of the transcript and publication to the jury.
First, he contended that, under La. C.E. art. 801D(1)(a)[7], as amended by Act 694 in 2004, the statement could now be used as substantive evidence. Second, the prosecutor argued that, under Crawford v. Washington[8] and case law interpreting Crawford from other states, since Louisiana case law had not yet addressed the issue, Williams' statements were admissible because a co-defendant's confessions are testimonial, Williams was unavailable to testify, and he was subject to prior cross-examination.
Defense counsel noted that he did not cross-examine Williams during that prior plea and he had not even been appointed to represent the Defendant at that time. He further argued that he could not cross-examine Williams at trial because Williams asserted his Fifth Amendment right. The prosecutor argued that Williams may not have been cross-examined at the time of the plea or at trial, but he was subject to cross-examination and that was sufficient. The trial judge stated that he did not think the law said that the witness had to be subject to cross-examination by the current Defendant's attorney. The trial judge further stated that Williams was subject to cross-examination by the district attorney, his attorney, and by anyone else who was available at the time of the plea. The trial judge thought that Crawford was silent as to who had to be there to cross-examine the witness. The trial judge then ruled as follows:
I'm going to find that it fits under 801, under the definition of 801, that it fits under "Crawford," because it is testimonial, it's definitively testimonial. It's not just a statement taken by police officers not under oath. And he was subject to cross-examination at the trial. Consequently, it's going to be admissible.
Defense counsel noted his objection and moved for a mistrial based on the trial judge's ruling. The trial judge denied the motion, stating that his ruling might be grounds for reversal but it was not *1107 grounds for a mistrial. Afterwards, the prosecutor called Paciera as a witness.
Paciera was the assistant district attorney who took Williams' plea. He testified regarding the substance of Williams' prior plea agreement and note of evidence. As stated above, Paciera then proceeded to relay the note of evidence taken during the entry of Williams plea, most pertinent here, repeating Williams' assertions that he and the Defendant were at the scene of the shooting, at the time of the shooting and that the Defendant, upon returning to Williams' car told Williams that he shot Lee. Paciera then went on to vouch for the veracity of Williams' statements as did the prosecutor in this case during closing arguments.
The Defendant argues on appeal that it was reversible error to admit this evidence before the jury in any and all of the three forms that it was admitted. He contends that this violated his constitutional right of confrontation and requires a reversal.
The State, on appeal, concedes that because the Defendant did not have a prior opportunity to confront Williams, the trial court erred by allowing into evidence the testimonial note of evidence taken during the entry of Williams' guilty plea.[9] However, the State argues that the errors were harmless in view of the other evidence of the Defendant's guilt.
The defense disputes the State's position, arguing that the erroneous introduction of this evidence cannot be viewed as harmless where, as here, it was admitted three separate times at trial, was combined with the prosecutor's assurances of its accuracy, and is the only direct evidence in the case linking the Defendant to the crime.
Confrontation errors, such as the ones here, are subject to a harmless error analysis and the verdict may stand if the reviewing court determines that the guilty verdict is surely unattributable to the error. La.C.Cr.P. art. 921; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993); State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680; State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, 206; State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102. Factors to be considered include the importance of the evidence to the State's case, whether the testimony was cumulative, the presence or absence of additional corroboration of the evidence, the extent of cross-examination permitted and the overall strength of the State's case. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Louviere, 00-2085 (La.9/4/02), 833 So.2d 885.
An erroneous trial ruling shall not require reversal of the conviction by an appellate court unless a substantial right of the accused has been affected. A reviewing court must determine whether there is a reasonable possibility that the complained-of error might have contributed to the verdict, that is, whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh'g denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *1108 State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291; State v. Green, 493 So.2d 1178 (La.1986). In other words, for the error to be considered harmless, the reviewing court must find beyond a reasonable doubt that the erroneously admitted evidence could not have affected the jury's verdict. State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680; State v. Sanders, 93-0001(La.11/20/94), 648 So.2d 1272, 1291.
Applying these precepts to the case before us, we cannot conclude beyond a reasonable doubt that the erroneously admitted evidence and the references made thereto by the prosecutor did not affect the jury's verdict. The admission of the hearsay statements of Williams, introduced through Paciera's testimony, questioning of Williams by the prosecutor as Williams repeatedly refused to answer under the Fifth Amendment, and the admission of the transcript of Williams' guilty plea proceedings, without the cross examination of Williams by the defense counsel, was trial error. This note of evidence was crucial evidence against the Defendant because it was the only direct evidence against him linking him to the commission of the crime. It was not cumulative, nor directly corroborated, defense counsel was denied the ability to cross examine the witness and the overall strength of the State's case without it was not compelling.[10] Based on our consideration of the entire record, we cannot conclude beyond a reasonable doubt that the erroneously admitted evidence could not have affected the jury's verdict or that the verdict was surely unattributable to the error. Therefore, we find that the errors were not harmless and that reversal of the conviction, vacation of the sentence and remand for retrial is mandated.[11]
Accordingly, for the reasons stated above, the Defendant's conviction is reversed, his sentence are vacated and the case is remanded to the trial court for a new trial.
REVERSED AND REMANDED.
NOTES
[1] State v. Prieur, 277 So.2d 126 (La.1973).
[2] State v. Davis, 04-K-1373 (La.App. 5th Cir.12/2/04) (unpublished).
[3] It is noted that Jarvis Wells was 14 years old at the time of the incident.
[4] Lee's mother, Jarutha S. Lee, later testified that, in January of 2000, Lee sometimes lived with her at 2336 Idaho Street, Apartment C.
[5] Wells testified that the man in the picture talked to Lee and could have talked to the man who shot Lee.
[6] La.C.Cr.P. art. 439.1 provides as follows:

A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
[7] La. C.E. art. 801D(1)(a) provides in pertinent part:

D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.
[8] Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[9] The State's concession is well supported by law since it has been consistently held that testimonial hearsay is only admissible when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross examine the declarant. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); State v. Smith, 04-3140 (La.6/24/05), 906 So.2d 391; State v. Lewis, 05-170 (La.App. 5th Cir.11/29/05), 917 So.2d 583.
[10] Absent the erroneously admitted evidence, the only non-hearsay record evidence against the Defendant was that he was in the area of the crime three hours earlier in a white car, he had gold teeth as did the perpetrator, and Lee stated that he was shot by "a dude in a white escort." Also the State produced an inconclusive, undated, picture of the Defendant holding a gun that was like the one used in the crime. The Defendant had witnesses that stated that the gun in the picture was not the same caliber as that used in the crime and that the Defendant was in Florida at the time of the crime.
[11] Any other errors assigned on appeal and not addressed in this opinion or rendered moot by our determination on this issue and will not be addressed.