993 So.2d 295 (2008)
STATE of Louisiana
v.
Byron L. DAVIS.
No. 08-KA-165.
Court of Appeal of Louisiana, Fifth Circuit.
July 29, 2008.
*296 Paul D. Connick Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Thomas Block, Albert Winters, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Attorney at Law, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., CLARENCE E. McMANUS, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
This is defendant's second appeal.
In State v. Davis, 05-987, pp. 2-3, 8 (La.App. 5 Cir. 5/9/06), 930 So.2d 1099, 1100, 1103-04, defendant's first appeal, this Court discussed this case in pertinent part:
[T]he Jefferson Parish Grand Jury indicted the Defendant with the second degree murder of Kemmione Lee ... in violation of La. R.S. 14:30.1. The Defendant was arraigned ... and pled not guilty.... [T]he case was tried by a 12-person jury ... [which] found the Defendant guilty as charged.... [T]he trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
*297 On appeal, this Court found that the admission of the hearsay statements of Joshua Williams, without the cross examination of Williams by the defense counsel, was trial error, and that those errors were not harmless. Davis, 05-987 at 16, 930 So.2d at 1108. Therefore, this Court reversed the conviction, vacated the sentence, and remanded for retrial. Id.
On June 19, 20, and 21, 2007, the case was tried again before a 12-person jury which found defendant guilty as charged. On July 16, 2007, defendant's motion for new trial was denied. On that same date, the trial court found defendant in contempt of court on two counts for disruption of court during sentencing and sentenced him to six months in parish prison on each count, with the sentences to run consecutively. The trial court also sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree murder conviction to run consecutively to the contempt sentences. Defendant filed a motion to reconsider sentence that was denied and a timely motion for appeal that was granted.

FACTS
The testimony at trial revealed the following:
Dr. Fraser Mackenzie, an expert forensic pathologist, testified that he performed an autopsy on the victim, Kimmione Lee, and that the cause of death was a gunshot wound to the abdomen with a perforating wound of the liver and stomach. Dr. Mackenzie further testified that he recovered a bullet from the left hand side of the body.
Joshua Williams testified that he went to see defendant on Thalia Court in the Calliope Housing Development in New Orleans on January 15, 2000 in order to buy heroin from him. During that conversation, defendant agreed to sell heroin to Williams at a future date. Defendant subsequently asked Williams to do him a favor by arranging a meeting with someone from whom he could purchase cocaine.
Williams and defendant left Thalia Court at approximately 7:00 p.m. in a small white four-door car and went to Kenner. Defendant put his .45 caliber chrome-colored gun under the front seat of the car. They went to Bunche Village, and then to Wilker Neal Street. When they got to Wilker Neal, Williams went inside "Ms. Janice's house" to smoke marijuana, and defendant remained outside. Williams came back outside approximately three minutes later and saw Kimmione Lee.
Williams walked up to Lee, and they had a conversation, during which Williams told Lee that defendant wanted to buy drugs. Lee told Williams that he had already talked to defendant, and that they had agreed that defendant and Williams were going to follow Lee to Lee's apartment on Idaho Street in Kenner. Lee turned into the driveway of the apartment complex, but Williams and defendant parked on a side street. Defendant grabbed his gun, put it on his left hip, exited his vehicle, and followed Lee's car.
Williams stayed inside the vehicle. He subsequently heard a gunshot and then saw defendant running down the driveway towards the car with his gun in his hand. Defendant, who was "hyper," got into the back seat and told Williams to move over and drive. Williams testified that defendant acted "like he just had did something." Williams moved over to the driver's seat and started driving, while defendant lay down in the back seat. Williams asked defendant what happened, and defendant said he would tell him later after they had left the area.
Williams drove to a friend's house in New Orleans. As Williams was about to exit the vehicle, defendant told Williams *298 that he had to shoot Lee because Lee had tried to rob him. Williams exited the vehicle, and defendant told him not to talk to anybody about what had occurred. Williams testified that defendant was wearing all black that day, including a black leather jacket and a black bandana around his neck. He also testified that at the time, defendant had four gold teeth in the top of his mouth, two on each side with white teeth in the middle.
Jarvis Wells, age 14 at the time of the incident, testified that on January 15, 2000, he went with Lee to run some errands. At some point, Wells and Lee went to Wilker Neal where the mother of Lee's child lived. When they pulled up, people were outside. Wells testified that Lee got out of the car and talked to the "guy" in the Polaroid picture, later identified as Timothey Ivey, and that "guy" talked to a person in all black.[1] Wells sat in the car, while Lee went inside. When Lee came back outside, he spoke to the "dude" in all black. Afterwards, Lee got into the car, and he and Wells drove off.
Wells and Lee ultimately went to Lee's mother's apartment on Idaho Street. Lee drove to the parking lot in the back, and Wells and Lee exited the car and went inside Lee's mother's apartment. While at the apartment, Lee and Wells made plans to go to Wal-Mart. As Wells walked to the car, while Lee was preparing to leave, a "dude" came from behind the bushes, held a large stainless steel gun on him, and asked him where his brother was. Wells told the "dude" that he did not know what he was talking about. The "dude" then escorted Wells back through the gate at gunpoint.
At that time, Lee had just finished locking the door to the apartment. He looked up and saw Wells and the "dude." Lee said something like, "You b. .tch, like he knew who it was." Lee tried to run back into the house, but the "dude" shot Lee. The "dude" then threw Wells to the ground and ran away. Lee told Wells to call an ambulance and the police, and then Lee crawled to his neighbor's door. Lee also told Wells and the police that a "white [e]scort" had tried to rob him.[2]
Three days after the shooting, Wells identified Ivey in a photographic lineup. He wrote on the back of that lineup, "This the guy that was in the yard talking to Kimmie."[3] Detective Watson showed Wells several more photographic lineups. Approximately three weeks after the shooting, in the fifth lineup, Wells tentatively identified defendant as the person who may have shot Lee.
Wells was not 100 percent positive of his identification because he could not tell from the photograph whether defendant had gold teeth on his "vamps." Wells testified that the "dude" who shot Lee had gold "vamp" teeth, but did not have gold on his front teeth. He reviewed the photograph of defendant, and stated that that was how the gunman's gold teeth appeared on the night in question. He also testified that that was the person in all black talking *299 to Lee and Ivey on Wilker Neal that night.
Timothey Ivey testified that, on January 15, 2000, at approximately 10:00 or 11:00 p.m., he went to Ms. Janice's house on Wilker Neal. When he got there, he saw people he recognized from the neighborhood; however, he also saw a "guy" dressed all in black whom he did not recognize. Ivey testified that the "guy" in black inquired about the whereabouts of his "partner" who sold drugs. He further testified that he saw Williams and the "guy" in black outside near a small white car with four doors.
At some point, Lee pulled up, and there was a "dude" in the car with him. Lee exited his vehicle, and as he did, Lee dropped crack cocaine on the ground worth approximately $600.00. Ivey testified that he told Lee to pick it up. Ivey further testified that the "guy" in the black jacket was standing in a position where he could see Lee drop the cocaine on the ground. Ivey and Lee then had a conversation after which Lee went inside Ms. Janice's house. When Lee came back outside shortly thereafter, Ivey and Lee arranged to meet later at a club. Ivey testified that Lee left in his car, and that Williams and the "guy" in black followed him. Ivey denied killing Lee.
Stella Womack testified that, in January of 2000, she was living in New Orleans with Williams. She further testified that, on January 15, 2000, at approximately 7:30 p.m., Williams told her that he and defendant were going to Idaho Street in Kenner. Womack walked Williams to the corner to meet defendant, and defendant and Williams left in a small white car. She positively identified defendant in a photographic lineup; however, she refused to sign the back of it because she was afraid. She testified that, in 2000, defendant had two gold teeth on each side with white teeth in the middle.
Viva Henderson testified that on January 15, 2000, defendant was living with her in the Calliope Housing Development. At that time, defendant had four gold teeth on the top, but his front two teeth were not gold. Approximately three weeks later, she allowed the police to search her apartment. During that search, the police recovered photographs of defendant holding a gun, defendant's box of bullets, and defendant's black leather jacket.
Detective Shaun Watson of the Kenner Police Department testified at trial that he recovered a .45 caliber spent casing from the scene and turned it over to Captain Timothy Scanlan for testing. Approximately one month after the murder, Detective Watson advised defendant of his rights, and defendant agreed to speak to him.
During the interview, defendant said that he did not know Williams and had never been to Kenner. Defendant also denied knowing anything about Lee's murder. When Detective Watson spoke to defendant that day, he noticed that defendant had gold teeth separated by front white teeth. Detective Watson testified that defendant was arrested for Lee's murder on August 2, 2002, and on that date, he again advised defendant of his rights. Defendant was willing to talk to the detective, but he refused to give a taped statement.
At that time, defendant again denied being in Kenner or being involved in Lee's murder. Defendant said the names of Williams and Womack sounded familiar, but that did not mean he knew them. Detective Watson testified that, on August 2, 2002, defendant still had the gold teeth in his mouth, but when defendant was in court on January 13, 2005, he did not have gold teeth.
*300 Captain Scanlan, an expert forensic scientist with a specialty in firearms and ammunition, testified that the .45 caliber casing recovered from the crime scene could only have been successfully fired through a .45 caliber automatic weapon. He further testified that the projectile recovered from the victim's body was consistent with .45 caliber class ammunition. He explained that the projectile was consistent with a Remington Peters Golden Saber projectile, a hollow point ammunition that expanded upon impact to cause more damage. Captain Scanlan identified the bullets in the box recovered from Henderson's apartment as .45 caliber target ammunition made by Remington Peters, the same manufacturer that made the Golden Saber hollow point bullet. Captain Scanlan reviewed enlargements of the photographs showing defendant holding a gun and testified that the gun could have fired the shot that killed Lee.
After the State rested its case, defendant testified that he did not kill Lee, and that the witnesses who testified against him were lying. He denied being in Kenner on the night in question. He testified that he did not remove his gold teeth in order to confuse the witnesses at trial.
By his first assignment of error, defendant argues that the State violated Brady[4] and Giglio[5] by failing to timely disclose impeachment evidence regarding the plea deal Joshua Williams received in exchange for his trial testimony. He contends that the State's failure to fully divulge this deal deprived him of the opportunity to confront and cross-examine Williams.
On May 10, 2007, defendant filed a motion to reveal the deal. In his motion, defendant requested that the State reveal any deals, implicit or explicit, that it had made with co-defendants or state witnesses in exchange for their testimony.
On June 12, 2007, the State filed an answer to defendant's motion. The State asserted that Williams was currently serving an eight-year sentence for manslaughter for his role in this case, and that he had also received a ten-year consecutive sentence for contempt of court for his refusal to testify at defendant's first trial. The State said that Williams understood that if he testified truthfully and completely at defendant's second trial, it would tell the court that he was no longer in contempt for refusing to testify. The State also said that it would not make any sentence recommendation to the court, and that the decision to reduce any, all, or none of the contempt sentence would be solely within the purview of the court. In conclusion, the State reiterated that it had made no deals, offers, or agreements to lessen Williams' sentence in exchange for his truthful and complete testimony.
On June 15, 2007, at the hearing on the motion to reveal the deal, defense counsel argued that she should be able to question any witness, specifically Williams, as to "what they thought that their testimony would give them in regard to any sweetening of the pot or any lessening of time." The trial judge stated that he was going to allow her to question the witnesses regarding that topic. He also stated that the motion to reveal the deal had been satisfied.
On July 25, 2007, after defendant was convicted at his second trial, the State filed a "Motion and Incorporated Memorandum to Modify and Reduce Contempt Sentences of Joshua Williams." In that motion, the State asserted that Williams had *301 refused to answer questions at defendant's first trial and, as a result, the trial judge found Williams to be in contempt of court 20 times and sentenced him to serve six months on each count to run consecutively to each other and to any sentence Williams was then serving. The State noted that that sentence was the maximum penalty provided by law under LSA-C.Cr.P. art. 25.
The State also informed the trial judge in its motion that Williams answered questions propounded by both the State and the defense at defendant's second trial. It submitted that Williams' testimony at defendant's second trial substantially mitigated his initial disservice to the criminal justice system during defendant's first trial. The State argued that modification of Williams' sentence under the facts of this case would comport with Louisiana jurisprudence. It noted that the Louisiana Supreme Court in State v. Bullock, 576 So.2d 453, 457-58 (La.1991) determined that where multiple counts are part of a single contemptuous episode, an appropriate penalty was concurrent sentences for contempt to run consecutively to the sentence on any underlying convictions.[6] The State contended that, pursuant to the authority of LSA-C.Cr.P. art. 881 B(1) and 881.1, the trial judge had the authority to reduce Williams' contempt sentences.
On July 27, 2007, at the hearing on the State's motion, Williams' attorney told the trial judge that Williams did not testify at defendant's first trial because of fear from threats against his family and himself. He reminded the trial judge that several contempt rulings and orders were placed on Williams as a result of his refusal to testify. Williams' attorney informed the trial judge that the case was re-tried.11 He explained that Williams testified honestly at defendant's second trial because the prosecutors had made Williams and his family feel comfortable about their safety. Williams' attorney said that he and the State were moving the court to reconsider the contempt sentences considering the fact that Williams testified in defendant's second trial.
The prosecutor noted that the trial judge had presided over both trials and, therefore, he was in the best position to observe Williams' demeanor during both of them. The prosecutor asked the trial judge to revisit the contempt citations for the reasons stated in the State's motion.
The trial judge said he had thought about "this one long and hard." He also said that he had expected "this thing [the 20 counts of contempt and sentences] to be handled in the appellate court," but that never happened. He was unsure if the matter had ever been appealed. The trial judge then stated that, based on the totality of the circumstances and having presided over both trials, he was not going to withdraw any of the "contempts." He asserted that he was, however, going to order the 20 counts of contempt to run concurrently with each other and consecutive to any other sentence Williams was serving.[7]
In State v. Demise, 98-0541, p. 16 (La.4/3/01), 802 So.2d 1224, 1237, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001), the Louisiana Supreme Court discussed the law regarding suppression of evidence favorable to the accused:
In Brady, the Supreme Court held that the suppression by the prosecution *302 of evidence favorable to the accused violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). Still, Brady and its progeny do not establish a general rule of discoverability. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
The Demise court also discussed the role of the reviewing court for purposes of Brady's due process rule:
For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citing Bagley, 473 U.S. at 678, 105 S.Ct. at 3381); Strickland[8], 683 So.2d at 234 (citing State v. Marshall, 94-0461, p. 14 (La.9/5/95), 660 So.2d 819, 825). Thus, the reviewing court does not apply an outcome-determinative test; rather, a Brady violation occurs when the court finds that the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
State v. Demise, 98-0541 at 17, 802 So.2d at 1237-38. (Footnote added).
In the instant case, defendant has failed to show that there was a deal between the State and Williams in which the State agreed to file a motion to reduce Williams' contempt sentences in exchange for Williams' testimony at defendant's second trial. Defendant is merely speculating that, because the State moved to reduce Williams' contempt sentences after defendant was convicted, there must have been a deal between the two of them. Although the State moved to reduce Williams' contempt sentences after it said it would not make any sentence recommendation, it did not ask the trial judge to sentence Williams to a specific amount of time. Instead, in its motion, the State advised the trial judge that Williams had substantially mitigated his initial disservice to the judicial system by testifying at defendant's second trial, and it cited the law that provided contempt sentences of this nature were usually served concurrently rather than consecutively. The State also advised the trial judge in its motion that he had the authority to reduce Williams' sentences, and that the decision to reduce the contempt sentences was solely in his purview.
Additionally, the fact that the jury was unaware that the State would later file a motion to reduce Williams' contempt sentences was not of sufficient significance to result in the denial of the defendant's right to a fair trial, nor did it undermine confidence in the outcome of the trial. United *303 States v. Agurs, supra; Kyles v. Whitley, supra. The jury heard lengthy testimony both on direct and cross-examination regarding Williams' understanding of the benefits he would receive by testifying.
Williams testified at trial that he entered into a plea bargain with the State wherein he pled guilty to manslaughter as a result of this incident and initially received a five-year sentence. He noted that the State had reduced the second degree murder charge to manslaughter and dismissed the conspiracy to commit armed robbery charge. Williams explained that, as a result of not testifying at defendant's first trial, the trial judge placed him in contempt of court and gave him a ten-year sentence. He further testified that the trial judge resentenced him on the manslaughter charge to eight years to run consecutively to the ten-year sentence for a total of 18 years.
Williams indicated that he was testifying at the present time because he wanted the trial judge to reconsider his ten-year contempt of court sentence. He testified that no one but the trial judge could make the decision as to whether his sentence was reduced. He further testified that he knew that the district attorneys could not make that decision, and that, even if they asked, the trial judge could refuse.
In light of the foregoing, we find that the evidence fails to show that the State violated Brady and Giglio by failing to timely disclose impeachment evidence regarding an alleged plea deal between the State and Joshua Williams. This assignment is without merit.
By his second assignment of error, defendant argues that the trial court erred by allowing the State to introduce evidence of other crimes. He contends that Williams' testimony that defendant was a drug dealer, and his testimony that defendant's family threatened him in court during defendant's first trial constituted inadmissible other crimes evidence. Defendant maintains that this evidence was improper and unduly prejudicial to his right to a fair trial as it inflamed the jury against him.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404 B(l); State v. Prieur, 277 So.2d 126, 128 (1973). However, evidence of other crimes, wrongs or acts may be introduced when it is independently relevant or when it relates to conduct, formerly referred to as res gestae, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." LSA-C.E. art. 404 B(1). A close connexity between the charged and uncharged conduct is required to ensure that "`the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" State v. Noten, 01-1818, p. 2 (La.6/25/01), 791 So.2d 607, 609 (per curiam).
The defendant bears the burden to show that he was prejudiced by the admission of other crimes evidence. State v. Dauzart, 02-1187, p. 9 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165-66. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404 B(1) will not be disturbed. State v. Merritt, 04-204, p. 11 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
Defendant first complains that evidence of the threats his family made against Williams at the first trial was inadmissible other crimes evidence.
*304 Williams explained that he refused to testify at defendant's first trial in 2005 because defendant's family scared him. Defense counsel objected, arguing that Williams' testimony suggested that defendant and his family were involved in intimidation, which was inadmissible evidence of other crimes. She also argued that she had no Prieur notice of those crimes.
The State responded that the jury had a right to know why Williams was held in contempt of court during defendant's first trial. The trial judge commented that it was not evidence of another crime committed by defendant. He ruled that he was going to allow Williams to testify as to what he saw, thereby, in effect, overruling the objection.
Williams proceeded to testify that defendant's family was taking pictures of him in court during defendant's first trial with a "picture phone," pointing at him with their fingers like they were going to shoot him, and gesturing with their hands like they were going to cut his throat. He testified that he reported defendant's family's conduct to the deputy who brought him to court, but that defendant's family continued their conduct.
The trial judge was correct in that the prosecutor made no reference to other crimes that were committed or allegedly committed by the defendant. Instead, the prosecutor's questions made reference to other crimes that were committed or allegedly committed by defendant's family. LSA-C.E. art. 404 B(1) only prohibits evidence of other crimes or bad acts committed by a defendant. Therefore, we find that the evidence in question was admissible and, therefore, the trial judge did not err by overruling defense counsel's objection to it.
Defendant next complains that evidence of his drug dealing, as testified to by Williams, was inadmissible other crimes evidence. At trial, Williams testified that defendant was a drug dealer. Defense counsel objected, but the trial judge overruled her objection. Williams proceeded to testify that defendant dealt drugs in the "Calliope Project" on Thalia Court. Defense counsel again objected, arguing that Williams could not testify regarding that issue unless he was present with defendant at that time. The trial judge agreed, in effect, by stating that Williams was going to have to testify as to his personal knowledge.
Williams then testified that he was there when defendant dealt heroin and cocaine. At that time, defense counsel moved for a mistrial, contending that the State had introduced evidence of other crimes without giving her Prieur notice. The State responded that this whole case was about drug dealing, and that defense counsel had brought it up. After defense counsel said she had not, the trial judge remarked that every witness from the beginning had talked about defendant's drug dealing, and that both sides had brought it up. The trial judge denied the motion for mistrial and stated, "Let's get off the drug dealing." Defense counsel noted her objection to the court's ruling.
Williams subsequently testified that, on the night in question, defendant agreed to sell heroin to him and, in exchange, Williams would arrange a meeting with someone from whom defendant could purchase cocaine. Williams also testified that, after they arrived at Wilker Neal, Williams told Lee that defendant wanted to buy drugs. Williams explained that he and defendant then followed Lee to his apartment so that defendant could buy drugs from Lee.
Under LSA-C.Cr.P. art. 775,
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the *305 jury dismissed when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
LSA-C.Cr.P. art. 770 provides in pertinent part as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]
. . . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Smith, 04-340, p. 5 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. Id.
A review of the record indicates that the trial judge was correct, in that the entire case revolved around drug dealing, that numerous witnesses testified that defendant was a drug dealer, and that both the defense and the State had elicited such testimony. Before Williams was called as a witness, Womack[9] testified during direct examination, without objection by the defense, that defendant sold drugs for a living. During cross-examination, defense counsel asked Womack if she saw defendant sell drugs, to which Womack responded affirmatively. After Womack completed her testimony, Henderson[10] was called as a witness by the State.
Henderson testified during direct examination that defendant sold crack cocaine at the Fox Lounge on Washington Avenue to make money. Defense counsel objected to the witness testifying regarding defendant's drug dealing, unless she had personal knowledge of it. The trial judge sustained the objection. Henderson then proceeded to testify, without objection, that she was aware that defendant sold drugs in the Fox Lounge area.
During cross-examination, defense counsel asked Henderson whether she received any benefit from defendant selling drugs, to which Henderson replied that he gave her money occasionally. Williams next testified, as was discussed previously, that defendant dealt cocaine and heroin in the Calliope Housing Development, and that Williams and defendant arranged to follow Lee on the night in question so that defendant could buy drugs from him. After the State rested its case, defendant admitted that he had a felony conviction for possession with intent to distribute cocaine that occurred in 1999.
*306 The evidence at trial showed that Williams and defendant followed Lee back to his apartment so that defendant could buy drugs from Lee, and that defendant shot Lee in an attempt to rob him. As such, we find that evidence regarding defendant's drug dealing was admissible, as it constituted an integral part of the act that was the subject of the present proceedings. LSA-C.E. art. 404(B)(1). Also, we find that the evidence was necessary to complete the story of the crime by proving its immediate context of happenings near in time and place. Noten, supra. Without the testimony regarding defendant's drug dealing, it would have been difficult for the State to present its case. Additionally, defense counsel herself elicited much of the testimony regarding defendant's drug dealing. In fact, she did not even object when Womack initially testified that defendant sold drugs for a living. Further, the trial judge instructed the State to turn its attention to matters other than defendant's drug dealing after defense counsel finally objected to testimony regarding it.
In addition, even assuming that evidence of defendant's drug dealing and of threats defendant's family made against Williams constituted impermissible references to other crimes, any such error is subject to a harmless error analysis. State v. Marsalis, 04-827, p. 6 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1085. The test for determining if an error was harmless is whether the verdict actually rendered in the case was surely unattributable to the error. Id., 04-827 at 8, 902 So.2d at 1087. Considering Williams' testimony that defendant admitted to him that he shot Lee, and in light of the other evidence at trial, we find that, even if this was other crimes evidence, the admission was harmless.
In light of the foregoing, we find that the trial court did not err by overruling defense counsel's objections and by denying the motion for mistrial. The assignment is without merit.

ERROR PATENT DISCUSSION
Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. The review reveals errors patent in this case.
The record shows that the trial judge failed to advise defendant of the two year prescriptive period for applying for post-conviction relief under LSA-C.Cr.P. art. 930.8. That article provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. We therefore remand the matter and instruct the trial court to inform defendant of the prescriptive period, set forth by LSA-C.Cr.P. art. 930.8, by sending written notice to defendant within ten days of the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Fazande, 05-901, p. 10 (La.App. 5 Cir. 3/28/06), 927 So.2d 507, 513-14.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. The case is remanded to the trial court with instructions.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] Wells later explained that, a couple of days after Lee was shot, he was at Lee's mother's apartment looking at some photographs when he saw a Polaroid photograph. He recognized one of the persons in that photograph as someone he saw talking to Lee on Wilker Neal on the night in question. Ivey later identified himself as that person in that Polaroid photograph.
[2] Adolph Federico, a former Kenner Police Department officer, testified that, when he arrived at the scene, Lee told him a couple of times that "`a dude in a white car'" had shot him.
[3] Lee's mother, Jarutha Lee, testified that "Kimmie" was her son's nickname.
[4] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[5] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[6] A review of that case confirms the State's contention.
[7] It is noted that, at the time of trial, Williams stated that he only had 45 days remaining on his eight-year manslaughter sentence.
[8] State v. Strickland, 94-0025 (La. 11/1/96), 683 So.2d 218.
[9] It is noted that Womack is the woman Williams was living with at the time of the incident.
[10] It is noted that Henderson is the woman defendant was living with at the time of the incident.