47 So.3d 1048 (2010)
STATE of Louisiana in the Interest of D.W.
No. 09-KA-855.
Court of Appeal of Louisiana, Fifth Circuit.
September 14, 2010.
Rehearing Denied October 29, 2010.
*1051 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Juliet Clark, Jeffrey Lagarde, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Katherine M. Franks, Attorney at Law, Louisiana Appellate Project, Abita Springs, LA, for Defendant/Appellant.
Panel composed of Judges CLARENCE E. McMANUS, FREDERICKA HOMBERG WICKER, and MARC E. JOHNSON.
CLARENCE E. McMANUS, Judge.
Defendant, D.W., was adjudicated delinquent for two counts of attempted first degree murder and sentenced to the Office of Youth Development until his 21st birthday. He now appeals this adjudication. For the reasons which follow, we affirm the adjudication and sentence imposed by the juvenile court.

STATEMENT OF THE CASE
On February 25, 2009, D.W., age 15, was charged by petition in juvenile court with two allegations of attempted first degree murder on minors, A.W. and J.D., in violation of LSA-R.S. 14:27; 14:30.[1] The juvenile denied the allegations on February 27, 2009. The adjudication hearing was held on May 20 and 21, 2009. The following facts were elicited from the trial in this matter.
On February 19, 2009, Detectives Eric Hunt and Willie Jones of the Jefferson Parish Sheriffs Office investigated shootings that occurred that day at a school bus stop in the 6700 block of Millender between Lincolnshire and Betty Streets in Marrero. Upon their arrival, they found two victims, J.D. and A.W., who had been shot. Detectives also interviewed witnesses who identified D.W. and J.F. as the "suspects." However, at trial, those witnesses testified that they did not see D.W. or J.F. shoot the victims.
Captain Timothy Scanlan, an expert in the field of firearms and tool mark examination, testified that D.W.'s hands were tested for gunshot residue approximately five or six hours after the shooting, and the tests were negative. He explained that the negative gunshot residue test did not exclude the fact that he may have handled or fired a weapon, because gunshot residue was a highly transient material that left the skin very quickly. Captain Scanlan also testified that he examined a small caliber projectile that was taken from one of the victims, and that it was consistent with .22 caliber class ammunition. He stated that for a .22, the explosion is a lot less, so there would be less gunpowder on the skin.
A.W., one of the victims, testified at trial that on the day in question, he got off the school bus and was walking home when someone called his name. He looked back and saw someone running towards him with a gun. That person started shooting at him, and he ran. A.W. testified that he was hit in his right lower leg. He explained that he was shot that day by someone who called his name, but that he did not see the shooter.
A.W. testified that he was in two "clicks," the "shireboys" and the "money *1052 gang," and that he had "shireboy" tattooed on his arm, which meant he was from Lincolnshire. He testified that "money gang" did not have any "beef with any other people, and that he did not know why he was shot. A.W. testified that he did not know if he was the target, and that when he was shot, he was running away. A.W. asserted that J.D. was with him that day, and that J.D. also got shot.
J.D., the other victim, testified that, on the day in question, he rode the bus to get home from school. When the bus pulled up to the stop in question, A.W. got off before he did. J.D. heard somebody say, "hey, [A.W.]." After that, J.D. heard a lot of gunshots, and he started running. J.D. testified that he was in the "money gang." He explained that he got shot in the arm, and that the doctors removed the bullet. He said he knew D.W., J.F., and A.W. from school. J.D. testified that he did not see D.W. with a gun that day, nor did he see J.F. there. He testified that he did not know who shot him.
Preston Gassery, the principal of Westbank Alternative School, testified that he went to the scene of the shooting on the day in question and talked to several of his students, B.J., C.B., and D.A. He further testified that he did not force them to give statements or talk to detectives, and he did not threaten any of them.
Detective Ricardo Ramos, Jr. testified at trial, although he was not involved with this case. He was sitting in the waiting room on the day of trial when he overheard an unnamed witness in the instant case say that, when he came into court, he was not going to say anything and that he did know anything. A woman later said, "you're going to rat," and a young man said he was not going to do that.
On May 21, 2009, the juvenile defendant, D.W., was adjudicated delinquent for two allegations of attempted first degree murder. On June 18, 2009, D.W. was sentenced to the Office of Youth Development until his 21st birthday. D.W. filed a timely motion for appeal that was granted.
On appeal, D.W. asserts two assignments of error: 1) the evidence is legally insufficient to meet due process standards because the trial judge erroneously based her adjudication upon exhibits never formally admitted into evidence and upon impeachment evidence improperly utilized as substantive evidence of guilt, and 2) the maximum available disposition in this case is both constitutionally excessive and violative of the precepts governing delinquency dispositions. For the following reasons, we affirm D.W.'s adjudication of delinquency for attempted first degree murder and affirm the sentence imposed by the juvenile court.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, D.W. argues that the evidence was insufficient to support the convictions. He contends that the trial judge erroneously based her adjudication upon exhibits never formally admitted into evidence. He also contends that the trial judge based the adjudication upon impeachment evidence improperly utilized as substantive evidence of guilt.
The State responds that the evidence was sufficient to support the adjudications. The State further responds that testimony concerning prior inconsistent statements of C.B. and other witnesses was not hearsay and could be used as substantive evidence of D.W.'s guilt under LSA-C.E. art. 801(D)(1)(a).
When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of *1053 the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed first.
The constitutional standard for testing the sufficiency of evidence requires that the evidence, direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt, in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a juvenile delinquency proceeding, the State's burden of proof is the same as in a criminal proceeding against an adult, to prove beyond a reasonable doubt every element of the offense alleged in the petition. State ex rel. B.L., 02-923, p. 3 (La. App. 5 Cir. 1/28/03), 839 So.2d 246, 247-48.
The rule as to circumstantial evidence is that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
Defendant was adjudicated delinquent for two counts of attempted first degree murder in violation of LSA-R.S. 14:30 and R.S. 14:27. First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. LSA-R.S. 14:30 A(3). Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. LSA-R.S. 14:27.
To prove an attempted murder, whether first or second degree, the State must establish, beyond a reasonable doubt, that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. LSA-R.S. 14:27, 14:30; State v. Fauchetta, 98-1303, p. 7 (La.App. 5 Cir. 6/1/99), 738 So.2d 104, 108, writ denied, 99-1983 (La.1/7/00), 752 So.2d 176. Although specific intent to inflict great bodily harm may support a murder conviction, attempted murder requires a specific intent to kill. Id.
In this case, witnesses from the scene gave statements to detectives implicating D.W. in the shootings. One witness positively identified D.W. in a photographic lineup. At trial, the witnesses recanted parts of their statements, testifying they did not see D.W. shoot anyone. The following is a discussion of each witness' statement and the testimonies presented at trial.

*1054 Statements and Trial Testimony of B.J.

On the day of the shootings, Detective Hunt took two statements from B.J. In his first statement, B.J. said that he was riding the bus on his way home from school. While on the bus, he heard everybody saying "somebody go down." B.J. explained they were saying that because they saw D.W. and another "dude" standing at the bus stop. B.J. knew D.W. because D.W. used to be in his class at Westbank Alternative. B.J. testified that when the bus pulled up at Millender and Lincolnshire, D.W. and the "dude" were standing at the bus stop by a blue four-door Corolla "cracking there [sic] knuckles with there [sic] hand behind there [sic] back." When B.J. got off the bus, he and his cousin, C.B., started walking home. They heard the victims ask D.W. and the "dude", "oh you got a tool you got a tool let me go get the tool." B.J. said that "tool" was a slang word for a gun. B.J. then heard the victim say "hold up let me go home and get the tool the other tool." B.J. told Detective Hunt that he saw D.W. with a .357 Magnum gun that was black with a brown handle. B.J. stated D.W. then started shooting and everybody started running. B.J. and C.B. began to run. B.J. said he glanced back and saw D.W. and the other "dude" running after the two victims shooting the gun. Afterwards, everybody started running in different directions. D.W. and the "dude" then got into the blue Corolla and left.
In his second statement given on that same date, B.J. said that D.W. was one of the shooters. He also identified the second shooter as number 2 in a photographic lineup. Detective Hunt testified at trial that B.J. positively identified J.F. in a photographic lineup as the other perpetrator of the offense.
At trial, B.J. recanted parts of his prior statements. B.J., age 14, testified that he went to school at Westbank Alternative with D.W., A.W., J.D., and J.F. B.J. testified that he was on the bus when people said, "it's about to go down." When he got off the bus with his cousin, he said he heard somebody yell A.W.'s nickname, and then "they" started shooting. B.J. testified that he and his cousin ran and B.J. did not see who fired the shots.
B.J. remembered meeting with detectives and giving a statement, which he was shown in Court. B.J. then testified at trial that he heard people on the bus saying, "it's gone down." He believed that they said that because they saw someone outside the bus. When asked who that was, B.J. responded that D.W. was outside the bus, but that he was just talking to somebody.
During questioning by the State, the prosecutor reminded B.J. that when he asked him earlier in his testimony what D.W. and J.D. were doing when the bus pulled up, B.J. said he did not remember. The prosecutor then asked B.J. to read his answer to that question from his statement, and B.J. read, "standing at the bus stop cracking their knuckles with their hands behind their backs."
The prosecutor reminded B.J. that in his statement to the detective he said that someone had said, "You got a tool?", which was a slang term for a gun. B.J. testified that he heard J.D. ask that question, but he did not know who J.D. directed that question to, because he was not "really watching it." In his statement, he said that J.D. asked D.W. and the other dude if they had a "tool." The prosecutor then pointed out that the detective asked B.J. if he saw D.W. with a gun, and that in his statement B.J. responded, "Yeah." However, at trial, B.J. testified that D.W. did not have a gun. B.J. testified that he lied in his statement when he told the detective that D.W. had a gun.
*1055 In his statement, B.J. also told the detective that the gun was a .357 Magnum and that it was black with a brown handle. He told the detective in his statement that the gun was on the person's back, and that he actually saw D.W. shoot at somebody. At trial, B.J. testified that when he looked back, D.W. was not shooting, but somebody else was shooting. B.J. testified that at the time of his statement, he thought it was D.W. On cross-examination, B.J. reiterated that, when he looked back, he thought he saw D.W. with a gun, but it was someone else and not D.W.

Statement and Trial Testimony of C.B.
On the date of the shooting, Detective Hunt also took a statement from C.B. C.B. stated that when he got off the bus that day, he saw two "dudes" standing and waiting outside a blue car and another one inside the car. He recognized one of them as D.W., a boy who went to his school. C.B. then stated that after he got off the bus, he saw A.W. and J.D. talking to D.W. and somebody else. Further, C.B. stated that A.W. and J.D. tried to walk off, which was when D.W. and the other kid pulled out some guns and started shooting. C.B. further stated that A.W. and J.D. ran in front of the store and the barber shop, and D.W. and the other person kept shooting at them, but eventually stopped, turned the corner, ran back to the car, hopped in it, and left. C.B. said that neither D.W. nor the other person jumped in the driver's seat. In his statement to the detective, C.B. stated that he actually saw D.W. shooting the gun, and that both D.W. and the other person pulled out the same type of gun and started shooting at J.D. and A.W.
At trial, C.B., age 15, testified that he went to school at Westbank Alternative. On the day in question, C.B. testified that he got off the bus and saw two people talking, one was on one side of the car and the other one was on the other side of the car. C.B. testified at trial that he saw D.W. on the side talking to some "dudes." He then testified that he saw A.W. and J.D. talking to D.W. and somebody else, and that he heard gunshots and saw the victims run. He testified that he thought the victims got shot, but did not "really see it." C.B. maintained that he "broke camp" when the gunshots were fired. The prosecutor then directed C.B.'s attention to his statement, specifically where C.B. was asked, "That's when [D.W.] and the other kid pulled out some gun?", and his answer was "yeah." C.B. also testified at trial that A.W. and J.D. started running toward the barber shop after that. C.B. testified that he did not remember how far D.W. and J.F. followed A.W. and J.D., but that A.W. and J.D. ran around the corner because they were being fired upon.
After being shown his statement, C.B. testified that J.D. and A.W. turned the corner because they were being shot at, and then C.B. "broke camp." C.B. testified that he saw D.W. and J.F. get in a car, but he did not see where they went. The prosecutor showed C.B. the question in the statement, "Did you actually see [D.W.] shooting the gun?", and his answer was "Um, yeah." However, C.B. denied saying "Yeah." C.B. testified at trial that he did not say that he saw "them" shooting the gun, and he did not remember telling the prosecutor that D.W. had a gun.
On cross-examination, C.B. testified that he did not see D.W. with a gun, and that Mr. Gassery, the principal at Westbank Alternative, made him say that. C.B. further testified that the statement that was recorded and transcribed was not accurate or true, and that no one forced or coerced him into changing his statement. On redirect examination, C.B. said that he lied when he told the detective that everything he had told him in his statement was *1056 true and that no one from the sheriffs office made him give that statement.

Statement and Trial Testimony of T.M.
At trial, T.M., age 15, recalled giving a statement to detectives on or about March 10, 2009. In both his statements and testimony, he told police that he did not see D.W. with a gun. T.M. explained that he did not get off the bus at Millender and Waters, and that the bus was pulling away when the shooting happened. He was asleep before the incident occurred, and he did not see D.W. at the scene.

Statement and Trial Testimony of Charles Newell
Charles Newell, age 18, testified at that on the day in question, he went to the school and gave D.W. and another man a ride from school and drove them to the bus stop. He stopped before the school bus, and D.W. and the other man got out of the car. Newell had his window down, and he and D.W. were talking about going out later that night. As he was talking to D.W., he heard arguing. Newell heard somebody scream out the name of a gang, or something like that, from around the bus.
After being shown his statement, Newell testified that a couple of guys got off the bus and one of them held up a chain that had an "m" and a "g" on it, which meant "money gang." Afterward, he heard gunshots, and he and D.W. ducked on the side of the car. When he heard the gunshots, he did not see D.W. run after anybody. Newell testified that he told the detective he did not see D.W. with a gun, and he did not see D.W. shoot. After the gunshots, D.W. and the other man got back in the car.
Newell said that in his statement, he told the detectives he saw a gun in the car after the shooting. However, Newell testified that his trial testimony was correct, and that he [gave that statement because he] felt intimidated by the detectives. Newell further testified that there was no discussion in the car on the way there that they were going to follow the bus and shoot people. After the incident, Newell drove D.W. and J.F. to Destrehan Street in Harvey and dropped them off. He admitted telling detectives that one of them told Newell, "you ain't see nothing." However, at trial Newell testified that D.W. did not say that. Although Newell testified at trial that he did not see a gun, he told the detective in his statement that the gun looked like "one you carry," and it had tape on it.
At trial, Detective Hunt testified that he was present when Detective Willie Jones presented Charles Newell with a photographic lineup and Newell positively identified D.W. Newell signed the back of the photographic lineup and this document was introduced into evidence at trial.

Sufficiency of the Evidence
As previously discussed, when the entirety of the evidence is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Hearold, supra. In this case, we find the evidence was sufficient under the Jackson standard to support the adjudications for attempted first degree murder. Hearold, supra.
At trial, the testimony indicated that several individuals were riding the bus home from school, including A.W., J.D., B.J., and C.B. When the bus got to the bus stop on Millender, B.J. heard people say, "it's about to go down." At that same time, Newell was waiting in a car near the bus stop, along with D.W. and J.F., whom Newell had picked up from school. A.W. and J.D. got off the bus, and someone called A.W.'s nickname. When A.W. *1057 turned around, he saw someone running towards him with a gun and shooting at him. J.D. was with A.W., and they both started running toward the barber shop. D.W. and J.F. got into Newell's car and left. A.W. and J.D. had both been shot. These facts were taken from the testimony at trial. Detective Hunt also testified at trial that Newell positively identified D.W. as the shooter in a photographic lineup.
In their prior statements to detectives, C.B. and B.J. both said that D.W. was one of the shooters, and B.J. positively identified J.F. as the other shooter. However, at trial, C.B. and B.J. recanted parts of their statements, including the parts that implicated D.W. in the shootings. Nevertheless, B.J. did testify at trial that he told the detective he saw D.W. shooting at somebody. He also testified that he told the detective that the gun D.W. had was a.357 Magnum and that it was black with a brown handle. C.B. also testified that he answered "Yeah," when the detective asked him in his statement if he saw D.W. and the other individual pull out a gun.
Newell testified at trial that he told the detectives he saw a gun in his car after the shooting, and that the gun looked like the "one you carry," and it had tape on it. Additionally, Newell positively identified D.W. as one of the shooters in a photographic lineup.
Thus, we find the entirety of the evidence is sufficient to support the adjudication of attempted first degree murder. In accordance with State v. Hearold, supra, we must now consider the assignments of error asserted by D.W. on appeal.

Admission of Evidence at Trial
D.W. argues the trial judge erroneously based her adjudication upon exhibits, specifically the prior statements of C.B. and B.J. that were never formally admitted into evidence at trial. We disagree and find the prior statements made by B.J. and C.B. to detectives were properly admitted at trial.
During B.J.'s testimony, the prosecutor started reading parts of B.J.'s statement without asking questions, and defense counsel objected to this line of questioning. The trial judge overruled the objection, noting that this was the witness' statement. After B.J. testified, the trial judge told the prosecutor he had not marked "those" for identification yet. The prosecutor said, "This S1 and S2?" The trial judge responded, "No, the statements." Defense counsel then objected to the introduction of the "statements" because "they were here to testify." The trial judge noted defense counsel's objection, but overruled it. During C.B.'s testimony, the prosecutor also used C.B.'s prior statement for reference in order to show inconsistencies in his trial testimony.
The statements of both B.J. and C.B. were each marked for identification as State's exhibits, stamped as filed by the trial court, and included in the exhibit envelope with the record on appeal. A review of the trial transcript indicates that the trial judge noted an objection by defense counsel to the introduction of the statements and overruled the objection. Defense counsel made other objections during direct examination of these witnesses while the prosecutor was utilizing these statements, however, these objections did not address the admissibility of these statements. Further, according to the transcript, during oral reasons given at the end of trial, the trial court specifically states it reviewed the transcribed statements which had been admitted into evidence without objection. Therefore, we find the statements were formally admitted into evidence at trial by the trial court and are properly included as exhibits in the appeal of this matter.

*1058 Use of Prior Inconsistent Statements

Next, D.W. contends that these prior inconsistent statements are inadmissible as hearsay under LSA-C.E. art. 607(D) and could not be used as substantive evidence of his guilt. Assuming a proper foundation, the credibility of any witness may be attacked by extrinsic evidence, including prior inconsistent statements. LSA-C.E. art. 607(D). Admission of the evidence requires a judicial determination that the probative value of the extrinsic evidence is not substantially outweighed by undue consumption of time, confusion, or unfair prejudice. LSA-C.E. art. 607(D); State v. Cousin, 96-2673, pp. 12-13 (La.4/14/98), 710 So.2d 1065, 1071. When a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt. Cousin, 96-2673 at 8-9, 710 So.2d at 1069. An exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of LSA-C.E. art. 801(D)(1)(c), Louisiana's counterpart of Fed.R.Evid. 801(d)(1)(C). State v. Johnson, 99-3462, p. 2 (La.11/3/00), 774 So.2d 79, 80. LSA-C.E. art. 801(D)(1)(c) provides:
. . .
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
. . .
(c) One of identification of a person made after perceiving the person;
. . .
In Johnson, the Louisiana Supreme Court quoted United States v. Brink, 39 F.3d 419, 426 (3rd Cir.1994), as follows: "`If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect.' (quoting Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, § 801(d)(1)(C) [01], at 801-222 (1993))."
In State v. Collins, 01-1459 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, writ denied, 02-2490 (La.6/27/03), 847 So.2d 1254, a witness at trial denied she told officers that defendant was the gunman. The officers and another witness testified, however, that the witness had informed them that defendant was the gunman. Id. The Fourth Circuit found the witness' prior statements were not hearsay because they fell within the exception provided by LSA-C.E. art. 801(D)(1)(c). Id. The Fourth Circuit noted that, although this Court in State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342, had narrowly construed this rule as applying solely to statements made in the context of an identification procedure, the rule had been applied to prior statements of identification made in a wide range of circumstances. State v. Collins, 01-1459 at 22-23, 826 So.2d at 613.
In this case, C.B. and B.J. both said in their statements that it was D.W. that shot at the victims. They recognized D.W. because they all attended the same school. The statements were made to detectives during the investigation and provided an identification of the shooter. Thus, we find the prior inconsistent statements of these witnesses constitute prior statements of identification for purposes of LSA-C.E. art. 801(D)(1)(c).
*1059 Additionally, the State argues the testimony concerning prior inconsistent statements of C.B. and B.J. were not hearsay and could be used as substantive evidence of D.W.'s guilt under the amended version of LSA-C.E. art. 801(D)(1)(a), which provides:
. . .
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement;
. . .
In State v. Harper, supra, the First Circuit found that the amended provision was substantially broader than its predecessor and rendered most prior inconsistent statements admissible in criminal cases provided the proper foundation was established. State v. Harper, 07-0299 at 13-14, 970 So.2d at 601. The Harper court further found, while the prior inconsistent statements were admissible to attack credibility under Article 607(D)(2), pursuant to the 2004 revision to Article 801(D)(1)(a), such non-hearsay statements were admissible for their assertive value, as well. State v. Rankin, 42,412, p. 7 (La.App. 2 Cir. 9/19/07), 965 So.2d 946, 950, writ denied, 07-2067 (La.3/7/08), 977 So.2d 897, and State v. Harper, 07-0299 at 13-14, 970 So.2d at 601, citing, George W. Pugh et al., Handbook on Louisiana Evidence Law 471-472, authors' note no. 9 to Article 607 (2006).
In State v. Harper, supra, the victim testified that the defendant placed a knife to her throat and forced her from Kimber's residence to her own residence. State v. Harper, 07-0299 at 10, 970 So.2d at 599. Two witnesses gave statements corroborating the victim's story; however, at trial, they recanted their statements. Id., 07-0299 at 12, 970 So.2d at 601. Defendant was convicted of simple kidnapping. The First Circuit found that the statements in that case were admissible to attack credibility and for their assertive value, finding that Article 801(D)(1)(a) was controlling, and not Article 607(D). Id., 07-0299 at 13-14, 970 So.2d at 601.
In State v. Rankin, supra, defendant, who was convicted of second degree battery, inflicted physical injuries upon the victim, his girlfriend. The victim gave statements in which she told the police that defendant inflicted her injuries; however, at trial, the victim recanted her prior accounts of the incident. State v. Rankin, 42,412 at 2-4, 965 So.2d at 947-49. The Second Circuit stated that, before the prior statements could be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the facts sought to be proved by these prior inconsistent statements. Id., 42,412 at 8, 965 So.2d at 951.
The Rankin court found that the other facts admitted by the defendant and the victim at trial supported the victim's earlier statements that the defendant was responsible for all of her injuries. State v. Rankin, 42,412 at 8, 965 So.2d at 951. The Second Circuit asserted that both testified to a scenario where the defendant found the victim in bed with an undressed man and became angry, and that the victim testified that defendant hit her in the head because he was mad, and she had to go to *1060 the emergency room because of that. Id. The court noted that no objections were raised to the use of the prior inconsistent statements and, therefore, it was impossible to determine whether the statements were allowed in for impeachment only or for their assertive value as well. Id., 42,412 at 9, 965 So.2d at 951. The court found that, having failed to make the objection, it was assumed the statements were admitted for both purposes. Id. The Second Circuit concluded that the record did not show an abuse of the trial court's discretion in deeming the statements admissible under LSA-C.E. art. 801(D)(1)(a). Id.
In the instant case, the central issue is whether D.W. shot one or both of the victims. The prior inconsistent statements of the witnesses showed that D.W. did so. However, before prior inconsistent statements can be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the "matter asserted" or the "facts sought to be proved" by these prior inconsistent statements. LSA-C.E. art. 801(D)(1)(a); State v. Rankin, supra.
C.B. testified at trial that the victims were talking to D.W. and someone else when C.B. got off the bus. C.B. testified he then heard gunshots and saw the victims run. C.B. further testified that he saw D.W. and J.F. then get into a car and leave. Newell testified at trial that D.W. and J.F. got into his car following the shooting and he gave them a ride. Newell admitted that he told the detectives that either D.W. or J.F. told him "[y]ou didn't see nothing" when he dropped them off.
Detective Hunt testified at trial that Detective Jones presented Newell with a photographic lineup. Detective Hunt was present at the time and saw Newell positively identify D.W. as the shooter in this case. Newell signed the back of the photographic lineup, indicating he had identified D.W. The photographic lineup was admitted into evidence at trial.
D.W. was implicated by several eye witnesses immediately after the shooting. Although these eye witnesses recanted their testimonies at trial, we must note, as the trial court did, that Detective Ramos' testimony offers an explanation as to all why all the witnesses' trial testimonies differ. While in the courthouse on the day of trial, Detective Ramos overheard the witnesses discussing their trial testimonies and the fact that one witness was not going to say anything and did not know anything. Further, one witness said to another witness "you're going to rat" and the witness responded that he was not going to do that.
Based on the above, we find additional evidence did corroborate the facts from the prior inconsistent statements. Therefore, we find no abuse of the trial court's discretion in admitting and using the prior inconsistent statements for their assertive value in accordance with LSA-C.E. art. 801(D)(1)(a). Additionally, we point out that there was no objection by the defense at trial regarding the use of the prior inconsistent statements. In State v. Rankin, supra, the Second Circuit noted that since no objection was raised regarding the use of prior inconsistent statements, it was impossible to determine whether the statements were allowed in strictly for impeachment purposes or for their assertive value as well. The Court in Rankin found that since the defense failed to make an objection, it was assumed the statements were admitted for both impeachment purposes and for their assertive value.
In conclusion, we first find the evidence, including the trial testimony, exhibits, and prior inconsistent statements, is sufficient under the Jackson standard to support the convictions. Therefore, D.W. is not entitled *1061 to an acquittal under Hearold. Second, we find that the trial judge did not err in considering the prior inconsistent statements as substantive evidence of D.W.'s guilt because the witnesses' prior inconsistent statements also constitute prior statements of identification under LSA-C.E. art. 801(D)(1)(c) and are admissible for their assertive value pursuant to LSA-C.E. art. 801(D)(1)(a) because there was additional evidence to corroborate the matter asserted. Thus, we affirm the trial court's adjudication of attempted first degree murder.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, D.W. argues that the maximum available disposition was both constitutionally excessive and violated the precepts governing delinquency dispositions. He concedes that removing him from his home environment is necessary, but argues that being placed in secure care until he is 21-years-old without consideration of less onerous or less lengthy alternatives that would also allow for education, counseling, and a structured environment shocks the conscience. He notes that, although he struggled in the school system, he had only one previous delinquency adjudication for disturbing the peace in 2007, a misdemeanor.
The Louisiana Constitution of 1974, Art. I, Sec. 20 prohibits "cruel, excessive, or unusual punishment." State ex rel. T.S., 04-1111, p. 3 (La.App. 5 Cir. 3/1/05), 900 So.2d 77, 79. "In considering dispositional options, the court shall not remove a child from the custody of his parents unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal." LSA-Ch.C. art. 901(A). State ex rel. T.S., 04-1111 at 6, 900 So.2d 80. "The court should impose the least restrictive disposition authorized by Articles 897 through 900 of this Title which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society." LSA-Ch.C. art. 901(B). Id. The commitment of the child to the custody of the Department of Public Safety and Corrections may be appropriate if, there is an undue risk that during the period of a suspended commitment or probation the child will commit another crime, the child is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment, a lesser disposition will deprecate the seriousness of the child's delinquent act, or the delinquent act involved the illegal carrying, use, or possession of a firearm. LSA-Ch.C. art 901(C). Id.
On appeal, the record must be reviewed when excessive commitment is complained of in juvenile proceedings in order to determine whether the Juvenile Court imposed the least restrictive disposition consistent with the circumstances of the case, the child's needs, and the best interest of society. LSA-Ch.C. art 901(B). State ex rel. T.S., 04-1111 at 5, 900 So.2d 79. A Juvenile Court has much discretion, because of the special nature of the proceedings, but the Juvenile Court must balance the needs of the child with the best interest of society. Id., 04-1111 at 5, 900 So.2d at 79-80.
At the sentencing hearing, Shernell Shepheard, the probation officer, testified that she conducted a predisposition investigation in this case, and that the probation department recommended secure placement. She further testified that a "staffing" was conducted with the Office of Juvenile Justice, and that they too concurred with secure placement, along with the psychologist who did the evaluation. She indicated that the only major problem she had with D.W. in school was him dancing *1062 around the school. She admitted that D.W. had not had any problems at Rivarde while he was there.
Following that testimony, defense counsel said that he disagreed with the trial judge's adjudication because none of the witnesses could identify D.W. as the perpetrator at trial. He also asked that the trial judge take into consideration the time that D.W. had already been incarcerated. The prosecutor responded that two witnesses identified D.W. as having a gun in his hand, and that the evidence showed that two people were shot. He argued that D.W. had proven that he was a danger to society and willing to use violence and should be imprisoned for the maximum length allowed by the code.
The trial judge stated that she took into consideration all aspects of this case, including the trial testimony. She said that two victims were shot and injured, and that she had no doubt that D.W. was the perpetrator of at least one of the shootings, along with another individual who was going to be tried as an adult. She agreed with the prosecutor that D.W. posed a risk to the community and that public safety would be jeopardized if she were to sentence him to anything less than secure care. Accordingly, the trial judge ordered that D.W. be sentenced to secure confinement until his 21st birthday on both counts to run concurrently.
The trial judge also ordered that D.W. be evaluated upon arrival at the Office of Juvenile Justice and that all recommendations of the evaluation be implemented. She ordered that D.W. receive an appropriate education for his age, vocational training, and anger management. She found that reasonable efforts had been made previously for D.W. in an attempt to keep him in the community. She said that he had been on active probation previously with the court and under supervision by the Department of Juvenile Services where services were rendered. She asserted that D.W. had also had been at Westbank Alternative school since he had been expelled from regular school, and that he had previously been confined at Rivarde.
The trial judge said she had taken into account the recommendations of the psychological evaluation indicating that D.W.'s responses to the evaluator suggested an invalid profile "on an individual who tended to minimize his problems and deny his involvement." She took into account the fact that D.W.'s sense of right from wrong was only somewhat developed which she believed also posed a risk to the community, and that he had difficulty following rules and regulations which he had previously demonstrated to the court on unrelated matters. She said that there were no signs of psychotic thinking, meaning that there was no mental disability that would account for D.W.'s behavior.
The trial judge further stated that she did not get the sense that there was any remorse whatsoever on D.W.'s part, and that he continued to minimize if not deny his involvement in the instant offense. Defense counsel asked if she would consider reviewing this case after six months. She responded that D.W. would have permanency hearings after one year of care and set a permanency hearing in January of 2010. Defense counsel asked if he could orally move to reconsider the sentence, but the trial judge advised him to file it in writing. She noted that D.W.'s mother had left the courtroom.
A review of the probation officer's report shows that D.W. had previously been on probation from December of 2007 to December of 2008, and that she had no problems with him during that time. The probation officer stated that the only problem was D.W. would not sit down at school *1063 because he was always dancing. She explained that when she conducted the predisposition investigation of D.W. at Rivarde, she became very concerned with the sudden change in him. She noted that D.W. now had tattoos and was allegedly involved in gang activity. She further noted that the instant charges stemmed from a disagreement between two rival gangs. The probation officer stated that she was "really afraid" for D.W. because "with those 2 charges and the nature of his crimes, anybody could have been out on the streets and could have been injured really bad or fatally." She remarked that D.W.'s mother always appeared sickly when she came to court.
In her report of the psychological evaluation, Dr. Christine Powanda noted that D.W. was placed on probation for disturbing the peace due to his involvement in a fight at Skate Country, and that he was expelled from middle school due to his receiving several suspensions and that he transferred to Westbank Alternative School. Dr. Powanda stated that D.W.'s responses revealed an individual who tended to minimize and deny his problem areas, and that his history suggested an identification on some level with the values and beliefs of a delinquent peer group. She said his sense of right and wrong was only somewhat developed, and that he had difficulty following rules and regulations. Dr. Powanda remarked that D.W.'s father was not an active parental figure, and his mother denied D.W.'s problem behaviors. After evaluating D.W., Dr. Powanda recommended that D.W. be placed in a secured juvenile facility.
After a review of the record, we find D.W. has a history of delinquent behavior. He was expelled from school, placed on probation for fighting, and then adjudicated delinquent in the instant case for two counts of attempted first degree murder, after he and a co-defendant shot at two victims while they were running away. The evidence indicates that the shootings were gang-related. Thus, it appears D.W. poses a risk to the community and public safety would be jeopardized if the trial judge sentenced him to anything less than secure care.
The trial judge considered all the evidence presented at the disposition hearing and felt that commitment was appropriate. Given the testimony at the disposition hearing as well as the predisposition investigation report, and considering the judge's wide discretion afforded in juvenile matters, we find that the disposition imposed was not excessive, and that it was the least restrictive disposition consistent with the circumstances of the case, the needs of the child, and the best interest of society.

ERROR PATENT DISCUSSION
This Court has determined that in juvenile cases, LSA-C.Cr.P. art. 920 mandates an error patent review whether or not defense counsel asked for it. State v. T.S., 04-1111, p. 9 (La.App. 5 Cir. 3/1/05), 900 So.2d 77, 82. This review reveals one error patent.
The trial judge failed to advise D.W. of the two-year prescriptive period for seeking post-conviction relief as mandated by LSA-C.Cr.P. art. 930.8. Therefore, we advise D.W., by this opinion, that no application for post-conviction relief, including an application which seeks an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 and 922. State v. Smith, 08-579, p. 10 (La.App. 5 Cir. 2/25/09), 9 So.3d 238, 244.
Accordingly, the adjudications of delinquency of D.W. for attempted first degree *1064 murder and the sentence imposed are affirmed.
AFFIRMED.
WICKER, J., Concurs in the Result and Assigns Reasons.
JOHNSON, J., Dissents with Reasons.
WICKER, J., concurs in the result and assigns reasons.
I agree with the writer's conclusion to affirm the adjudications and dispositions.[2] But I respectfully concur with the writer's analysis of the assignments of error regarding the statements.

The Parties
These are the parties who are involved in this matter:
The parties who were arrested for these offenses: (1) The adjudicated juvenile delinquent, who is identified as "DW." (2) The codefendant who is being tried as an adult and who is identified as "JF."
The victims: (1) Victim 1, "AW." (2) Victim 2, "JD."
The two state witnesses who recanted their police statements: (1) Eyewitness 1, "CB." (2) Eyewitness 2, "BJ."
The defense witness who testified he drove the juvenile and the codefendant JF to the scene: Driver, "CN."[3]
The defense witness who testified he was on the bus and he did not see the juvenile with a gun: Bus Witness "TM."

Underlying Facts
On February 19, 2009, Victim 1, AW and Victim 2, JD were shot in the Lincolnshire neighborhood after they exited a school bus. Victim 1, AW and Victim 2, JD were shot in the leg and arm, respectively. After the shooting, the victims were transported to the hospital where a .22 caliber projectile was removed from the arm of Victim 2, JD. Two eyewitnesses; namely, Eyewitness CB and Eyewitness BJ gave statements to the police the day of the shooting identifying the juvenile as one of the shooters. Detective Hunt testified that he had interviewed Eyewitness BJ three times and that he was twice recorded. He interviewed Eyewitness CB once.
Detective Hunt identified two photographic lineups that were introduced into evidence. He testified that Eyewitness BJ identified the codefendant, JF, in a photographic lineup. The second photographic lineup was shown to Driver CN, who identified the juvenile in the photographs shown. However, during cross-examination, Detective Hunt testified that he did not obtain any evidence from CN identifying the juvenile as holding the gun. Therefore, there was no photographic lineup in which a witness identified the juvenile DW as a shooter. The only identification of the juvenile DW as a shooter was made by statements given by Eyewitness BJ and Eyewitness CB the day of the shooting.
Eyewitness BJ and Eyewitness CB also provided the prosecutor with similar details on a later date. At the hearing, however, they recanted all of their prior statements identifying the juvenile DW as the shooter. They testified that their principal, Preston Gassery, forced them to identify the juvenile DW and that they lied in their previous statements. On the other hand, Mr. Gassery testified that he spoke to these witnesses at the scene but he *1065 denied forcing them to give any statements or threatening them in any way. The juvenile DW and the other male suspect codefendant JF were at the bus stop having been driven there by Driver CN. Driver CN gave a statement to the police the day after the shooting in which he stated that he noticed that after the shooting there was a gun in his car. At the hearing, however, Driver CN recanted that statement. He testified that he did not see a gun. Driver CN admitted at the hearing that he told the detective that when he dropped the juvenile DW and the other male suspect codefendant JF after the shooting, Driver Carl CN was told that he, Driver CN "did not see nothing." At the hearing, however, he testified that the juvenile DW did not make this statement to him. Detective Hunt testified that he arrested the juvenile DW and the other male suspect codefendant JF for these offenses. He stated that the male suspect codefendant JF was being tried as an adult.

Introduction of Exhibits
Defense counsel argues that the judge erroneously based her adjudications upon exhibits never formally introduced into evidence. Defense counsel asserts that the prosecutor offered testimony from the two alleged eyewitnesses, BJ and CB, but the prosecutor never formally offered the entire statements into evidence.
CB's and BJ's statements were introduced into evidence. After CB and BJ testified, the court informed the prosecutor that he had not marked the statements for identification. Defense counsel objected to the introduction of the statements because the witnesses were present to testify. The court overruled defense counsel's objection. Therefore, having overruled the defense counsel's objection to the introduction of the statements, the court necessarily admitted the statements into evidence.

The Statements as Substantive Evidence of Guilt
Defense counsel argues that the judge based the adjudications upon BJ's and CB's unsworn out-of-court statements as impeachment evidence that was improperly used as substantive evidence of guilt.
In this case, these eyewitnesses recanted their out-of-court statements wherein they identified the juvenile DW as a shooter. Thus, the out-of-court statements were the sole evidence to establish DW's guilt beyond a reasonable doubt.[4]
La. C.E. art. 801(D)(1)(c), Louisiana's counterpart of Fed.R.Evid. 801(d)(1)(C), provides that a prior statement by a witness is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement" and the statement "is one of identification of a person made after perceiving the person."
The Louisiana Supreme Court in State v. Johnson, 99-3462, p. 2 (La.11/3/00), 774 So.2d 79, 80 affirmed that when a non-party witness's credibility is attacked through a prior inconsistent statement incriminating the accused, the evidence is *1066 generally not admissible for its assertive value as substantive evidence of guilt. However, the Court recognized the identification exception provided in La. C.E. art. 801(D)(1)(c).
Contemporaneous identifications generally are given much more credence; indeed, such identifications are considered reliable enough to justify their exclusion from the hearsay rule, even when the witness is unable to repeat the identification in the courtroom. Samuels v. Mann, 13 F.3d 522, 527 (2nd Cir.1993), cert. denied, 513 U.S. 849, 115 S.Ct. 145, 130 L.Ed.2d 85 (1994) (Citations omitted).
The Johnson Court cited with approval United States v. Brink, 39 F.3d 419, 426 (3rd Cir.1994), and Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, § 801(d)(1)(C) [01], at 801-222(1993). Johnson, 99-3462 at 2-3, 774 So.2d at 80.
In Brink, the federal court stated: "Generally, evidence is admitted under Rule 801(d)(1)(C) [the federal counterpart to the Louisiana rule] when a witness has identified the defendant in a lineup or photospread, but forgets, or changes, his testimony at trial." (Citations omitted).
The Brink Court explained the federal counterpart to Louisiana's identification nonhearsay rule:
Debate on the 1975 amendment to the Rule demonstrates Congress was aware that third parties would testify to the witness's prior statements. See 121 Cong.Rec. 31,867 (1975) (statement of Rep. Hungate) ("The bill ... applies to situations where an eyewitness has previously identified a person out of court. It would admit into evidence testimony of that identification. For example, testimony by a police officer that at a lineup John Doe identified the defendant as the man who robbed his store."). See generally, Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, ¶ 801(d)(1)(C)[01], at 801-222 (1993) ("If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect."). Thus, Miller's statement should have been admitted as substantive evidence.
Id.
In State v. Hester, 99-426, pp. 18-19 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 108, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342, this Court held that La. C.E. art. 801(D)(1)(c) applied to a formal photographic identification procedure, thereby limiting the type of statement subject to the nonhearsay identification rule. However, Hester was decided before the guidance provided by the 2002 Louisiana Supreme Court case of State v. Stokes, 01-2564, pp. 1-2 (La.9/20/02), 829 So.2d 1009, 1010 (Per Curiam), where the Louisiana Supreme Court held:
A prior statement by a witness which is "[o]ne of identification of a person made after perceiving the person," is non-hearsay when the witness appears and is cross-examined on the statement. La. C.E. art. 801(D)(1)(c). Such a statement may be used assertively, as substantive evidence of guilt, and may be established through the testimony of one to whom the statement was made. This is so even if the witness denies making an identification or fails or is unable to make an in-court identification. State v. Johnson, 99-3462, pp. 2-3, 774 So.2d 79, 80-81. The federal rule is similar. See Fed.R.Evid. 801(d)(1)(C); United States v. Brink, 39 F.3d 419 (3rd Cir.1994); United States v. Jarrad, 754 F.2d 1451 (9th Cir.1985). See also 5 Weinstein's Federal Evidence, (MB) § 801.23[1], p. *1067 801-39 (2nd ed., Joseph M. McLaughlin, ed., 2002).
By referring to "a prior statement," the Louisiana Supreme Court did not limit the rule to formal photographic lineups or photospreads. In fact, the Stokes Court cited with approval a case involving photospread statements as well as a case involving a non-photospread statement, U.S. v. Jarrad, 754 F.2d 1451 (9th Cir.1985), cert. denied, Jarrad v. United States, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985), cert. denied, McManamy v. United States, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985) and United States v. Brink, 39 F.3d 419, 426 (3rd Cir. 1994), respectively.
In Jarrad, the court held that an agent's testimony as to a witness's identification was not hearsay. In that case the testimony took place during an attempted photospread identification. Jarrad, 754 F.2d at 1456. In Brink, at trial, the witness testified she was unable to recall the bank robber's eye color. The FBI agent testified that the day after the robbery, she told him the bank robber had dark colored eyes. Brink, whose eyes are light hazel, sought to use the prior statement as substantive evidence of his innocence, but the court refused. The Brink court held that "the fact that FBI agent McEachern, rather than Miller, recited Miller's statement at trial does not preclude introducing her statement as substantive evidence." Brink, 39 F.3d at 424-26, 426.
In my view, the latest pronouncement from the Louisiana Supreme Court in Stokes recognizes that the identification rule applies not only to photographic lineups or photospreads but to statements of identification as well. Accord: State v. Brue, 09-2281 (La.App. 1 Cir. 5/7/10), 2010 WL 1838383, *10 (unpublished) (rule to include an out-of-court unsworn and uncorroborated videotaped statement in response to police questioning, where witness refused to testify or answer questions.); State v. Tumblin, 02-1643, p. 6 (La.App. 4 Cir. 9/17/03), 857 So.2d 1045, 1049 (rule applied to an out-of-court statement made to the police immediately after the shooting where the witness recanted the statement.).
Accordingly, I would hold that the out-of-court statements made to the police near the time of the incident are nonhearsay evidence and could be used as substantive evidence of guilt.
Furthermore, even assuming the nonhearsay identification rule does not apply to this case, I would hold that the following nonhearsay rule applies: La. C.E. art. 801(D)(1)(a), the prior inconsistent statement by a witness.
I recognize the extraordinary difficulty the writer herein faced in attempting to reconcile State v. Allien, 366 So.2d 1308, 1310 (La.1978) and State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065 and the Allien-Cousin progeny with legislative changes in the hearsay rules.
In State v. Lubrano, 563 So.2d 847, 849 (La.1990) (Per Curiam) (emphasis in original), the Louisiana Supreme Court held that where the state's case rests entirely on hearsay evidence, counsel's failure to object does not necessarily foreclose inquiry into the reliability of the result. In that case, there was no other independent evidence to indicate that the hearsay evidence, the defendant's timecards, was accurate. 563 So.2d at 850. In State v. Jones, 610 So.2d 782, 784 (La.1992) (emphasis in original), the court explained that when the state's case rests entirely on evidence regarding out-of-court assertions of fact, that court is not precluded from inquiring into the reliability of the result for due process purposes.
"Under a modern view of the hearsay rule, [inconsistent] statements [of a witness] *1068 are exempt from the rule and admissible as substantive evidence of the facts stated." 1 McCormick on Evidence § 34, at 149 (6th ed.2006).
Traditionally, the prior statement has been admissible as substantive evidence to prove the truth of the matter asserted only when falling within an established exception to the hearsay rule. 2 McCormick on Evidence § 251, at 148 (6th ed.2006). "This position has come under substantial attack on both logical and practical grounds." Id. The rationale behind the "orthodox/traditional view is that the witness's previous statement is hearsay resting on the credit of the declarant, who, when the statement was made, was not under oath, in the presence of the trier of fact, or under cross-examination." Id. "As Wigmore, who originally adhered to the traditional view, observed: `Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the hearsay rule has been already satisfied.'" 2 McCormick on Evidence § 251, at 149. One persuasive factor against the orthodox/traditional rule is the superior trustworthiness of the earlier statements on the basis that those statements are more recent in time. Id. There has been a substantial movement to completely abandon the orthodox/traditional view. 2 McCormick on Evidence § 251, at 150. Evidence of a prior inconsistent statement, when the declarant is on the stand to explain it, has the major safeguards of examined testimony. 2 McCormick on Evidence § 251, at 151.
Nevertheless, even while clearly admissible as substantive evidence, jurisdictions disagree with whether such a statement standing alone is sufficient to sustain a conviction. 2 McCormick on Evidence § 251, at 151, n. 19.
In People v. Chavies, 234 Mich.App. 274, 593 N.W.2d 655 (Mich.App.1999), Leave to Appeal Denied, 461 Mich. 930, 605 N.W.2d 320 (1999), Chavies v. Michigan, 531 U.S. 841, 121 S.Ct. 105, 148 L.Ed.2d 63 (2000), overruled on other grounds by People v. Williams, 475 Mich. 245, 716 N.W.2d 208 (Mich.2006), the Michigan court noted:
The sufficiency of the evidence is an issue separate and distinct from the question of admissibility. In the context of prior inconsistent statements, the question is whether, viewing the witnesses' [prior] grand jury testimony in the light most favorable to the prosecution, the evidence was so unreliable that no reasonable trier of fact would accept it as sufficient to support defendant's convictions beyond a reasonable doubt. 593 N.W.2d at 660 (Citation omitted).
In Chavies, the court described the conflicting approaches to the question of whether out-of-court statements alone would be sufficient to support a conviction where the witness recanted testimony. Id. 593 N.W.2d at 660-661. The court noted that Louisiana was one of those states that still adhered to the common law rule that prior inconsistent statements are hearsay inadmissible as substantive evidence, and may only be used for impeachment. 593 N.W.2d at 661, citing State v. Allien, 366 So.2d 1308, 1310 (La.1978).
In Allien, the Court noted that it had consistently held that a prior inconsistent statement of a witness cannot be admitted as substantive evidence of the truth of its content; the effect of its admissibility is limited to impeaching the credibility of the witness and his testimony. 366 So.2d at 1310. In State v. Jackson, 526 So.2d 1261, 1263 (La.App. 3 Cir.1988), the Third Circuit explained that when the prior inconsistent statements were introduced in order to impeach the credibility of the witness, they were nonhearsay as they were *1069 not being offered to prove the matter asserted therein. Thus, the prior inconsistent statements used as impeachment evidence could not be substantive evidence. Id.
In 1998, the Louisiana Supreme Court reaffirmed Allien in State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065. At the time, La. C.E. art. 802(D)(1)(a) classified as nonhearsay a prior statement of a witness at trial that was inconsistent with the witness's trial testimony and was given under oath at the preliminary examination or prior trial of the accused. Thus, under the facts of that case, the inconsistent statements were hearsay. 96-2973 at 7, 710 So.2d at 1069. La. C.E. art. 607(D)(2), however, permitted then as it does now the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. The Court held that: "Although such evidence is admissible for impeachment, this court has steadfastly recognized that `when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt.'" 96-2973 at 8, 710 So.2d at 1069.
Thus, when Cousin was decided, only those prior statements of a witness at trial that were inconsistent with the witness's trial testimony and were given under oath at the preliminary examination or prior trial of the accused were nonhearsay and could be used as substantive evidence. 96-2973 at 10, 710 So.2d at 1070 (The Court explained that when the Louisiana State Law Institute proposed the Louisiana Code of Evidence to the Legislature, the substantive impeachment rule was thus restricted.).
The restriction changed in 2004. La. C.E. art. 801(D)(1)(a) was amended by 2004 La.Acts., No. 694, § 1, effective August 15, 2004. The current article provides that a statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]
In State v. Rankin, 42,412 (La.App. 2 Cir. 9/19/07), 965 So.2d 946, writ denied, 07-2067 (La.3/7/08), 977 So.2d 897, the Second Circuit concluded that the Allien-Cousin line of cases predated the 2004 amendment, which now allows those La. C.E. art. 801(D)(1)(a) nonhearsay statements as admissible for their assertive value. 42,412 at 6-7, 965 So.2d at 950-51.
Likewise, the Allien-Cousin line of cases predated the 1995 amendment to La. C.E. art. 801(D)(1)(c). By 1995 La. Acts, No. § 1 the Legislature amended the article to provide that a statement is not hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is "one of identification of a person made after perceiving the person[.]" La. C.E. art. 801(D)(1)(c). In 2000, the Louisiana Supreme Court, in State v. Johnson, 99-3462, p. 2 (La.11/3/00), 774 So.2d 79, 80, the Court recognized the identification rule provided in La. C.E. art. 801(D)(1)(c). Therefore, in Johnson, the Louisiana Supreme Court diverged from the orthodox/traditional rule expressed in Cousin.
*1070 In the present case, the declarants, who recanted their out of-court statements to the police were subject to cross-examination at the hearing. The prosecutor directed each declarant to their statements and allowed them the opportunity to admit the facts. Thus, under Article 801(D)(1)(a) the question presented herein is whether there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statements. In this case where the state's case rests entirely on evidence regarding out-of-court assertions of fact, independent corroboration affords the juvenile due process because such corroboration ensures the reliability of the resulting adjudications. State v. Lubrano, 563 So.2d 847, 849 (La.1990) (Per Curiam); State v. Jones, 610 So.2d 782, 784 (La. 1992).
In Chavies, supra, the court noted that other states require some degree of corroboration before a prior inconsistent statement will be found to be sufficiently reliable to support a conviction. Id. (Citations omitted). In State v. Mancine, 124 N.J. 232, 248, 251-252, 590 A.2d 1107, 1117 (1991), the New Jersey court held: "A prior inconsistent statement for which substantial evidence exists corroborating any of its specific elements and enhancing its seeming reliability is corroborated in its entirety and may be used for all purposes." The court held that a prior inconsistent statement may solely support a conviction even without corroboration of each element of the crime under these circumstances: (1) The statement is generally corroborated. (2) Its reliability is supported by the circumstances under which it was given. (3) The defendant has the opportunity to cross-examine the declarant. 124 N.J. at 252, 590 A.2d at 1117.
One of the circumstances here showing corroboration is that the two witnesses gave the same statement to the police identifying the juvenile as the shooter. In the analogous case of Henry v. State, 861 P.2d 582, (Alaska App.1993), the Alaska court explained that the rule governing corroboration is a flexible one that is grounded in common sense. 861 P.2d at 587. It held that corroborating evidence is sufficient when it induces a rational belief in the truthfulness of a witness's testimony. Id. (Citation omitted). The court concluded that the "independent accusations of sexual abuse" of two victims who recanted their prior inconsistent statements was sufficient corroborating evidence. In the initial statement, one victim told the police about the abuse of the other victim. Shortly afterwards, the other victim corroborated that accusation without knowing that that victim had already made a similar accusation. The circumstances gave the jurors a rational basis to distrust the victims' recantations at trial and to credit their earlier statements to the authorities and their testimony at a grand jury. Thus, the requirement of corroboration was met, and the jury's verdicts were supported by sufficient evidence. Id.
Bearing these precepts in mind, I would note that there are sufficient indicia of reliability in this case. I acknowledge that the two witnesses' inconsistent statements were the only evidence directly implicating the juvenile in the attempted murders. There was no independent corroboration of the witnesses' statements that the juvenile was the shooter. However, both witnesses gave statements to the police on the day of the offenses wherein they identified the juvenile that substantially matched the testimony they later gave to the prosecutor. They also corroborated each other's version of the events by each identifying the juvenile as the shooter. Also, the driver, CN gave a statement to the police wherein he said he saw a gun in the car after the shooting. Although he recanted that statement at the hearing, his police statement *1071 was consistent with the statements by the two witnesses who in their earlier police statements identified the juvenile as a shooter. Additionally, several of the circumstances surrounding the statements were corroborated independently at the hearing: (1) There was undisputed testimony that the juvenile DW and the male suspect JF were at the scene; (2) Eyewitness CB testified at the hearing that before the shooting, he observed the two victims talking to the defendant and another person. (3) Eyewitness CB testified that he saw "two dudes just shooting." (4) Driver CN testified that after he dropped off the juvenile DW and the other male after the shooting, he was told that he "didn't see nothing." That statement suggests guilty knowledge.
The evidence as a whole, viewed in the light most favorable to the prosecution, was sufficient to support DW's adjudications. Determining the weight of the police statements and resolving credibility disputes was within the exclusive province of the trier of fact.
Accordingly, while I agree with the writer to affirm, I respectfully concur in the result.
JOHNSON, J., Dissents with Reasons.
I, respectfully, dissent from the majority opinion. After review of the overall evidence (admissible and inadmissible), I find that there was evidence sufficient for the adjudications of attempted first degree murder. However, I find the consideration of inadmissible evidence requires a new trial. See State v. Hearold, 603 So.2d 731, 737 (La.1992). To be more specific, the reliance of the trial court on the prior inconsistent statements as substantive evidence of D.W.'s guilt requires a new trial.
Assuming a proper foundation is laid, the credibility of any witness may be attacked by extrinsic evidence, including prior inconsistent statements. See LSA-C.E. art. 607(D)(2). Admission of the evidence, which bears solely on the issue of credibility, turns on a judicial determination that the probative value of the extrinsic evidence is not substantially outweighed by undue consumption of time, confusion, or unfair prejudice. Id.; State v. Cousin, 96-2673, pp. 12-13 (La.4/14/98); 710 So.2d 1065, 1071. When a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt. Cousin, 96-2673 at 8-9, 710 So.2d at 1069. An exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of LSA-C.E. art. 801(D)(1)(c), Louisiana's counterpart of Fed.R.Evid. 801(d)(1)(C).[1]State v. Johnson, 99-3462, p. 2 (La.11/3/00); 774 So.2d 79, 80.
In State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99); 746 So.2d 95, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342, Hester complained that the trial court erred in allowing the detective to testify over defense objection to Ms. Mack's initial description of the perpetrators, when said testimony added more details than were included in the victim's own testimony. Id., 99-426 at 18, 746 So.2d at 108. This Court found that the detective's testimony was hearsay to the extent it was not cumulative *1072 of Ms. Mack's own testimony. This Court found that this testimony did not fall under LSA-C.E. art. 801(D)(1)(c) because Ms. Mack gave the descriptions to the detective before she made the photographic identifications, and they had nothing to do with an identification procedure. Id., 99-426 at 18-19, 746 So.2d at 108. This Court further found that, although the trial court erred in allowing the testimony at issue, such error was harmless because Ms. Mack positively identified both defendants in photographic lineups, as well as in court. Id., 99-426 at 19, 746 So.2d at 108.
In United States v. Kaquatosh, 242 F.Supp.2d 562 (E.D.Wis.2003), the government moved in limine for an order that law enforcement officers be permitted to testify as to identifications made by two witnesses. The government indicated that officers would testify as to statements made by Freeman and Waupoose who both told officers that they observed defendant hit the victim with a piece of wood. Id. at 562-63. Neither Freeman nor Waupoose observed defendant in a lineup, show-up, or photo array and then identified him. Rather, they simply advised officers that they observed defendant hit the victim. Id. at 563. The appellate court found that statements such as these were not identifications, and that pre-trial identifications occurred when a witness viewed a defendant in a lineup, show-up, or photo array, or at a preliminary hearing. Id. at 566. It further found that pre-trial identifications did not include statements unaccompanied by recognition of the defendant or his likeness. Id. The appellate court denied the government's motion because the statements at issue were not "identifications" under Rule 801(d)(1)(c), and because the government expected the witnesses to testify, such that the testimony of the officers would be cumulative and could mislead the jury. Id. at 562, 565, 567.
In the instant case, the State argues that the testimony concerning prior inconsistent statements of C.B. and other witnesses was not hearsay and could be used as substantive evidence of D.W.'s guilt under the amended version of LSA-C.E. art. 801(D)(1)(a). However, defendant contends that under LSA-C.E. art. 607(D), the statements were still hearsay and could not be used as substantive evidence of his guilt. In any event, the State argues that under the current version of LSA-C.E. art. 801(D)(1)(a), the statements were not hearsay, and thus, they were admissible not only to impeach, but also as substantive proof of the offense.
LSA-C.E. art. 607 provides, in pertinent part:
Art. 607. Attacking and supporting credibility generally
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
* * * * *
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
*1073 If the witness has had a fair opportunity "to admit the fact and has failed distinctly to do so," extrinsic evidence of a prior inconsistent statement is admissible, not to prove the truth of the matter asserted, that is, not for its hearsay content, but to establish the fact of contradiction as a means of impeaching a witness' general credibility. State v. McGee, 07-130, p. 7 (La.App. 5 Cir. 6/26/07); 963 So.2d 449, 453, citing, State v. Owunta, 99-1569 (La.5/26/00); 761 So.2d 528, 529 (per curiam). However, if the witness admits the statement, he has impeached himself by his own testimony and thus, the prior inconsistent statement is inadmissible. State v. McGee, supra.
In the instant case, the State questioned B.J. and C.B. regarding their prior statements. At trial, B.J. testified that he did not see D.W. shoot the victims. However, B.J. admitted at trial that he made the statement to the detective that D.W. had a gun and that he saw D.W. shoot at somebody. Since the State had already accomplished the impeachment of the witness through his trial testimony, the written document of B.J.'s prior inconsistent statement was unnecessary to impeach the witness' credibility under Article 607(D). See State v. McGee, supra; State v. Harper, 07-0299, p. 13 (La.App. 1 Cir. 9/5/07); 970 So.2d 592, 601, writ denied, 07-1921 (La.2/15/08); 976 So.2d 173. However, C.B. denied at trial that he made the statement to the detective that he saw D.W. shooting the gun. Therefore, the written document of C.B.'s prior inconsistent statement was admissible to impeach the witness' credibility under Article 607(D). State v. McGee, supra; State v. Harper, supra.
Additionally, C.B. and B.J. both said in their prior statements that D.W. shot at the victims. They recognized D.W. because they all attended the same school.[2] The prior inconsistent statements should not have been given substantive effect because they did not constitute prior statements of identification under LSA-C.E. art. 801(D)(1)(c), since the statements were not taken in connection with formal identification procedures. Hester, supra; United States v. Kaquatosh, supra. B.J. and C.B. did not identify D.W. from a photographic lineup; rather, they both told the detectives that D.W. was one of the shooters, and that they knew D.W. from school.
Prior to its revision by 2004 La. Acts No. 694, § 1, Article 801(D)(1)(a) provided that a prior statement by a witness is not hearsay if the declarant testifies at the trial or hearing and is subject to crossexamination concerning the statement, and the statement is inconsistent with his testimony, and was given under oath subject to the penalty of perjury at the accused's preliminary examination or the accused's prior trial and the witness was subject to cross-examination by the accused. State v. Harper, 07-0299 at 13, 970 So.2d at 601.
Following the 2004 revision, LSA-C.E. art. 801(D)(1)(a) now provides that a prior statement by a witness is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is, in a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent *1074 statement. [Emphasis added]. State v. Harper, 07-0299 at 13, 970 So.2d at 601.
In State v. Rankin, 42,412 (La.App. 2 Cir. 9/19/07); 965 So.2d 946, writ denied, 07-2067 (La.3/7/08); 977 So.2d 897, defendant, who was convicted of second degree battery, inflicted physical injuries upon the victim, his girlfriend. The victim gave statements in which she told the police that defendant inflicted her injuries; however, at trial, the victim recanted her prior accounts of the incident. State v. Rankin, 42,412 at 2-4, 965 So.2d at 947-49. The Second Circuit stated that, before the prior statements could be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the facts sought to be proved by these prior inconsistent statements. Id., 42,412 at 8, 965 So.2d at 951.
As mentioned in the majority opinion, the central issue is whether D.W. shot one or both of the victims. The prior inconsistent statements of the witnesses state that D.W. did so. However, before prior inconsistent statements can be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the "matter asserted" or the "facts sought to be proved" by these prior inconsistent statements. LSA-C.E. art. 801(D)(1)(a); State v. Rankin, supra.
There was no additional evidence introduced at trial to corroborate that D.W. shot at one or both of the victims and, therefore, the statements were inadmissible under Article 801(D)(1)(a). Rankin is distinguishable from the instant case because there was other testimony at trial in Rankin to support the convictions, even though witnesses recanted their prior statements. In other words, there was additional other evidence to corroborate the matter asserted by the prior statements. LSA-C.E. art. 801(D)(1)(a). In Rankin, although the victim recanted her prior statement incriminating the defendant, the victim did testify at one point during trial that defendant hit her in the head, and she had to go to the emergency room as a result of the head injury.
Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of the evidence is harmless error. State v. Galliano, 05-962, p. 37 (La.App. 5 Cir. 8/29/06); 945 So.2d 701, 726, writ denied, 06-2367 (La.4/27/07); 955 So.2d 682. The inquiry is whether the guilty verdict actually rendered in the trial was surely unattributable to the error. State v. Galliano, 05-962 at 37-38, 945 So.2d at 726, citing, State v. Maise, 00-1158 (La.1/15/02); 805 So.2d 1141, 1148.
The admissions of the statements in this case were not harmless because they were the only evidence submitted that D.W. shot, at least, one of the victims, and that evidence was not merely cumulative or corroborative of other evidence. State v. Galliano, supra. A review of the trial judge's reasons for judgment shows that she clearly considered the statements as substantive evidence of D.W.'s guilt. As such, I find that the verdict rendered in this case was surely attributable to the error and a reversal and remand for a new trial is mandated.[3]
NOTES
[1] In order to maintain the confidentiality of the proceedings, as required by LSA-Ch.C. art. 412, we will use initials for all of the juveniles involved.
[2] The Louisiana Children's Code refers to a judgment of disposition rather than a sentence. La.Ch.C. arts. 684(A) and 678(A).
[3] Although this witness testified that he was 18 years of age at the time of the hearing, I prefer using his initials in this juvenile proceeding to protect the juvenile's privacy.
[4] Defense counsel did not specifically object to the introduction of the statements on the basis that they were hearsay evidence which could not be used as substantive evidence. In fact, defense counsel attempted to introduce out-of-court statements in order to show a discrepancy between the statement and the affidavit for the search warrant. In this regard, defense counsel argued that the affidavit stated that both witnesses identified the juvenile DW by his full name where the recorded statement showed otherwise. The prosecutor objected on the basis that the transcribed testimony was hearsay. The judge stated that she did not think defense counsel could introduce the statement at that point, explaining that eyewitness CB would be available for cross-examination.
[1] LSA-C.E. art. 801 D(1)(c) provides:

D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(c) One of identification of a person made after perceiving the person[.]
[2] D.W. was not identified in the photographic lineups because Detective Hunt did not have a photograph of D.W. at the time.
[3] See State v. Davis, 05-987 (La.App. 5 Cir. 5/9/06); 930 So.2d 1099. In that case, this Court stated that it could not conclude beyond a reasonable doubt that the erroneously admitted evidence could not have affected the jury's verdict or that the verdict was surely unattributable to the error. Therefore, this Court found that the errors were not harmless and that reversal of the conviction, vacation of the sentence and remand for retrial was mandated. Id., 05-987 at 16, 930 So.2d at 1108.